# ISAIAH FOUNTAIN

## *vs.*

# THE STATE OF MARYLAND.

*Criminal Law—Postponement of Trial—Mob Violence.*

It is the right of a person charged with crime to have the question of his guilt or innocence determined by a fair and impartial trial according to law, and he is entitled to have the verdict represent solely the effect of the evidence and not the influence of popular sentiment. p. 83

In general the suspension or postponement of a trial is within the discretion of the court, and its ruling will not be disturbed on appeal unless such action is plainly required in the interests of justice. p. 85

Where a negro, under trial for rape, was threatened with death by a mob and, having escaped in the resulting confusion, was recaptured and again placed on trial, with the conditions such that the court regarded it as necessary to call for the State militia and an auxiliary force of police from another city, and these matters were known to the jury, *held* that it was error to refuse a motion to postpone the trial. pp. 84, 85

*Decided July 17th, 1919.*

Appeal from the Circuit Court for Talbot County (AD-KINS, C. J., and WICKES, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, and URNER, JJ.

*Eugene O'Dunne,* for the appellant.

*Albert C. Ritchie, Attorney General,* and *Ogle Marbury, Assistant Attorney General,* with whom was *Charles J. Butler, State's Attorney for Talbot County,* on the brief, for the State.

URNER, J., delivered the opinion of the Court.

In the course of the trial of the appellant for rape, in the Circuit Court for Talbot County, he filed a motion for a postponement of the trial on the ground that it could not be fair and impartial under the conditions then existing. The motion alleged and offered to prove, in substance and effect, that when the Court adjourned at 10 o'clock at night on the first day of the trial about two thousands persons were assembled on the Court House grounds, on which the county jail was also located, and while the appellant was being taken from the Court House to the jail through the crowd a determined effort, accompanied by personal violence inflicted upon him, was made to take him from the custody of the officers of the law and lynch him, this purpose being openly declared by members of the crowd, some of whom were armed with various weapons and provided with ropes; that the officers attempted to hold the crowd at bay with their pistols as it surged upon the porch of the jail while the appellant was pushed through the outer door of the building, and that, prompted by his fear and the immediate danger of lynching, he took advantage of an opportunity to escape in the dark through an open window, and was not retaken until two days later; that the fact of his escape was announced by the Court to the jury as a reason for the suspension of the trial until his recapture; and that a reward of $5,000 was offered by the Court for the rearrest of the appellant and his safe return to the courtroom. It was at the time of the resumption of the trial on the morning after the recapture of the accused that his motion just referred to was filed. In addition to the allegations already summarized the motion averred that the defendant "by reason of the interruption of the orderly procedure of the administration of justice due to mob violence actually perpetrated upon him while in the custody of the law and in the actual trial of his case (from which mob violence he attempted to escape by flight because of insufficient protection of law), finds himself so prejudiced in the further progress of said case as to be utterly and hopelessly unable

to receive a fair and impartial trial by any further action in the present so called trial and proceeding; and that the same amounts to a denial of due process of law, to a denial of all constitutional guarantee of a fair and impartial trial, or to the constitutional right of a jury trial." It was further alleged that the defendant was confronted with the alternative of "being prejudiced before the jury by the announcement made to the jury, by the Court, that the defendant had made his escape from the authorities during the progress of the trial, from which the inference of guilt as a cause for flight may be drawn by the jury," or of "rebutting said presumption by proof of flight from mob violence perpetrated upon him in the Court House grounds within five minutes of the adjournment of Court and while the jury was still in the box"; but that "by adopting the latter course he becomes prejudiced in the trial of said case, by injecting into the minds of the jury the intensity of the feeling of the populace surrounding the Court House, to such an extent that the jury itself becomes thereby intimidated and unable fully and freely to do its duty in the premises, as it may see it, solely from the standpoint of the law and the evidence given under oath in open Court."

The application of the defendant for a stay of the proceedings was refused, and the trial was continued, resulting in his conviction and a sentence of death.

The record contains a certificate of the trial Court, signed at the instance of the defendant's counsel, as follows:

"After the case of State v. Isaiah Fountain had been assigned for trial on Easter Monday, April 21st, 1919, the court was desirous of knowing whether the case was to be tried on that day so as to make its arrangements for other work in the circuit or for sitting in the Court of Appeals, and to that end caused inquiry to be made informally of Mr. O'Dunne as to whether the case was to be removed or not.

"In response to a long-distance telephone call, Mr. O'Dunne came to Easton on Friday night, April 18th, and stated to the Presiding Judge of the Court that he

brought with him an affidavit of removal signed by
Isaiah Fountain and sworn to by him for the purpose
of asking a removal. Mr. O'Dunne suggested that the
case be removed to Baltimore City, but the Court de-
clined to entertain the suggestion of removal to Balti-
more City and said that in the event of the case being
removed it would not be sent out of the circuit; where-
upon Mr. O'Dunne stated that he would therefore not
file the affidavit of removal.

"The circumstances under which the $5,000 reward
was offered were brought about by the escape of the de-
fendant a few minutes after 10 P. M. on the night of
April 21st, 1919, the Court having held a night session
until 10 o'clock, and when the prisoner was removed
from the court house room to the jail building in the
Court House Square, a large concourse of people had
assembled on the court house grounds, and certain
threats of violence towards the prisoner were made by
some of those assembled there, which resulted in his
then and there escaping from the crowd, and from the
officers who had him in custody. The next morning the
Presiding Judge of the Court in the court room com-
mented upon the disgraceful proceeding resulting in
the escape of the prisoner, and offered a reward on be-
half of the citizens of Talbot County of $5,000, for
his capture and return unharmed to the custody of the
Sheriff of Talbot County, and suggested to the Sheriff
in open court the swearing in of all assembled who
would volunteer as deputy sheriffs for that purpose.
Several hundred persons volunteered and were sworn
in as deputy sheriffs, including Mr. O'Dunne, the pris-
oner's counsel.

"(In the afternoon before the prisoner was returned
and before the occurrences hereinafter set out, the jury
had retired with the bailiffs to another part of the
town, where they ate and slept, out of sight and hear-
ing of the occurrences now about to be stated.)

"The prisoner was reported captured late in the aft-
ernoon of April 23 at a point in the State of Dela-
ware, and as news of his capture reached Easton a large

crowd of people assembled at the Court House Square
between the court house door and the jail door, both
located on the same plot of ground enclosed by an iron
railing fence.  As the news reached Easton that the
defendant was about to be brought back to the jail by
his captors in an automobile, addresses were made to
the assembled crowd from the porch of the jail, in
which the populace was exhorted to be peaceful and
law-abiding and let the law take its course in an orderly
fashion.  Chief Judge Wm. H. Adkins addressed the
crowd along this line; also the Mayor of Easton, W.
Mason Shehan and Eugene O'Dunne, the prisoner's
counsel, at the close of whose remarks the prisoner
arrived and was safely conducted into the jail and back
into the custody of the Sheriff without any interfer-
ence on the part of the crowd.  The Presiding Judge
invited those who had been sworn in as deputy sheriffs
and others who desired to be sworn in as deputy sher-
iffs to report to the court room across the open green;
that he had further matters to communicate to them.
The court room was quickly filled, whereupon the Pre-
siding Judge stated to those assembled that he desired
to take them into his confidence to say that he had
just been in communication with the Chief Executive
of the State, and that he was reliably informed that the
present crowd in Easton was likely to be augmented
that night by three or four thousand additional per-
sons who it was expected would arrive in Easton some
time that night.  He asked those assembled whether
they felt able and were disposed to take care of the sit-
uation in Easton that night, or whether they would
prefer that he avail himself of the offer of the Gov-
ernor to send the constituted legal authority of the
State, to wit, a company of uniformed State Militia,
augmented by an auxiliary force of policemen from
Baltimore City, who could arrive there in machines
during the night.  The matter being further discussed
by various speakers, the sense of those assembled finally
was that the court was asked to use its judgment
for preserving law and order by the use of such power

and authority as it deemed expedient, including the
use of the State Militia and an auxiliary police force
from Baltimore City, with the result that between mid-
night and dawn a company of uniformed State Militia
arrived at the court house, and was augmented by some
25 members of the Baltimore Police Force who came
down by machine, in addition to the 15 members
already there.  On the arrival of the State Militia, they
were stationed to guard the approaches to the court
house and the jail and were placed as pickets on the
inside of the iron rail fence around the court house
plaza, and with drawn bayonets permitted no one to
enter the Court House Square except those having offi-
cial business with the court, and the several hundred
persons who had been sworn in as deputy sheriffs two
days before, and other persons who were properly
vouched for.  'The court of its own motion inserts the
following in brackets: (The jury were absent from
the court house at the place where they ate and slept,
in another part of the town, at the time of the return
of the prisoner after the capture and at the time of the
addresses to the crowd and the conference in the court
room, last above referred to.)'  From the adjournment,
10 P. M. Monday night, to 9.30 A. M. Thursday, April
24th, the hour set for resuming the further trial of the
case, the jury were held together in charge of bailiffs
with the use of the court house room and the grand
jury room, and they were escorted under proper cus-
tody through the town of Easton to and from the place
where their meals were served, and where they slept,
and on April 24th, 1919, shortly before the hour set
for the opening of court, they were properly escorted
in charge of the regular bailiffs through the town of
Easton to the court room, which necessitated their pass-
ing through the picket line of State Militia guarding
the Court House Square.

"(At the resumption of the trial the jury were espe-
cially cautioned by the court against permitting them-
selves to be prejudiced against the prisoner on account
of his escape after the beginning of the trial, and were

told that in the opinion of the court no inference of guilt could properly be drawn from the fact of such escape, which was due to fear of the crowd.)

"Trial ended late in the afternoon of Thursday, April 24, 1919, and on the verdict of guilty by the jury and sentence of death then and there pronounced by the Court upon the defendant, he having stated through his counsel that he had nothing further to say why sentence should not be pronounced, the defendant, by authority of the court, was directed to be lodged in the Baltimore City Jail awaiting the day to be set by the Governor for his execution."

The appeal in this case presents a question of vital importance in the administration of justice. It is concerned with the right of a person charged with crime to have the question of his guilt or innocence determined by a fair and impartial trial according to law. This right is absolute and fundamental. It rests upon the clearest and strongest principles of justice, and it is safeguarded in the most imperative terms by constitutional provisions which directly declare the will and mandate of the people.

The issue tried before the jury in this case was whether the prisoner at the bar, who is a colored man, was in fact the negro who committed the rape charged in the indictment. There was no question that the unfortunate girl who testified as prosecuting witness had been brutally outraged, but the defense was that the accused was not the perpetrator of the horrible crime, and that he was in reality a number of miles distant from the scene of the assault at the time it occurred. It was his undoubted right to raise such an issue of fact and to have it determined by the verdict of a jury under circumstances which would enable it to exercise its independent judgment. He was entitled to have the verdict represent solely the effect of the evidence and not the influence of popular sentiment. In order that the defense interposed might be impartially considered, it was necessary that the jurors should have the opportunity to calmly weigh the evidence

without having their minds distracted and dominated by undue manifestations of public hostility against the prisoner.

The conditions under which the appellant was tried were such as to make it almost impossible for the issue upon which his life depended to be impartially considered and decided by the jury. It is in the highest degree improbable that the jury as a whole could have kept its judgment free from the influence of the demonstrations made against the accused in the immediate neighborhood of the Court in which the trial was being conducted. The presence of a large and menacing crowd, determined that the prisoner should die, and unwilling to await the orderly processes of the law, which had been set in motion with the utmost promptness; the attempt to forestall by lynching the verdict of the jury and a judicial sentence; the flight of the defendant to escape immediate death at the hands of the mob, and the unusual measures taken by the Court to insure his safety when recaptured, evidencing the belief of the Judges as to the extreme gravity of the emergency with which they were confronted, combined to create an atmosphere and environment incompatible with the right of the accused to a fair and impartial trial.

According to the general rule, the suspension or postponement of a trial is recognized as being within the discretion of the trial Court, and its ruling on a question of that nature will not be disturbed on appeal unless such action is plainly required in the interests of justice. In 16 *Corpus Juris*, p. 484, a discussion of the law relating to applications for continuances in criminal cases, on the ground of public excitement and prejudice, includes the following statement: "In any event such excitement must be such that its natural tendency would be to intimidate or swerve the jury; and as the Court in which the case is pending can much better determine the propriety of a postponement on this ground than can the appellate Court, it requires a very strong showing to induce the upper Court to interfere."

There can be no doubt that the Court below made earnest efforts to protect the defendant's right to a fair trial, but the conditions with which the Court had to deal appear to have rendered such a trial at that time and place impracticable. In such an extraordinary situation as that in which the lower Court was placed in this case, and with such vital issues involved, its ruling upon the application to have the trial deferred could not properly be held to be so far discretionary as to be beyond the scope of appellate review.

The argument on behalf of the State proceeded in part upon the theory that the jury is not shown by the record to have been fully cognizant of the occurrences and conditions to which the defendant's motion refers. It is difficult to imagine that the jurors could have remained in ignorance of the presence, temper and conduct of the crowd on the Court House grounds through which they passed repeatedly on their way to and from the sessions of the Court. But it affirmatively appears from the record that the Court informed the jury of the flight of the prisoner to escape the violence of the crowd. As we understand the record, it shows also that the comments of the Court "upon the disgraceful proceeding resulting in the escape of the prisoner," and its offer of a reward of $5,000 for his recapture and safe return, and its suggestion to the Sheriff as to "the swearing in of all assembled who would volunteer as deputy sheriffs for that purpose," were made in the presence of the jury. The certificate of the Court, narrating with perfect candor and fairness the incidents which impeded and disturbed the trial, furnishes ample and compelling reasons for our conclusion that the prisoner did not have a fair trial and that his motion for a temporary stay of the proceeding should have been granted.

While we should be entirely satisfied to rest our decision simply upon the elementary rule of right and justice which the appellant has invoked, there are adjudications in other States which fully support the conclusion we have reached. *State* v. *Weldon,* 91 S. C. 29, 39 L. R. A. (N. S.), 667; *Massey* v. *State,* 31 Tex. Crim. Rep. 371, 20 S. W. 758;

*Frederickson* v. *State,* 44 Tex. Crim. Rep. 288, 70 S. W. 754;
*Collier* v. *State,* 115 Ga. 803, 42 S. E. 226; *State* v. *Wilcox,*
131 N. C. 707; *People* v. *Fleming,* 166 Cal. 357, 136 Pac.
291; *State* v. *Manns,* 48 W. Va. 480, 37 S. E. 613; *Capps* v.
*State,* 109 Ark. 193, 159 S. W. 193, 46 L. R. A. (N. S.)
741; *Sanders* v. *State,* 85 Ind. 318.

It is not our duty or right to pass upon the weight of the
evidence and to express an opinion as to its sufficiency to sup-
port the verdict actually rendered.   That was a question which
the appellant was entitled to have decided by a jury exempt
from such influences as those which operated in this case,
and by which any jury of ordinary human sensibilities would
have been practically certain to have been affected preju-
dicially to the accused.

It is natural that popular wrath and indignation should be
aroused by such an atrocious offense as this record discloses.
But the identification and punishment of the criminal must
be left to the careful and regular processes of the law, how-
ever deep and just may be the public sense of horror at the
crime.   The law does not tolerate any interference with the
right of the humblest individual to be accorded equal and
exact justice, and, when charged with crime, to have the ques-
tion of his guilt or innocence fairly and impartially deter-
mined.   It is of the highest concern to the peope and courts
alike that this vital and sacred right shall be preserved invio-
late.

*Judgment reversed, and new trial awarded.*