# BRYANT *v.* STATE

[No. 91, October Term, 1954.]

*Decided July 14, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Howard A. Vogel* for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Blair H. Smith, State's Attorney for Prince George's County,* and *C. Orman Manahan, State's Attorney for Howard County,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Eugene E. Bryant, age 21, a resident of Hillside, a suburb of Washington, was tried before a jury in the Circuit Court for Howard County for the murder of Joan Marie Ruzza, age 17, of Capitol Heights. He was found guilty of murder in the first degree, and was sentenced to be hanged. He has appealed here from the judgment.

The murder was committed in Capitol Heights on the evening of April 8, 1954, at about 8 o'clock. The body of the young girl, who was a student at the Suitland High School, was found that night at 11:30 o'clock in a private driveway on 49th Avenue. Appellant, who was a veteran of the Korean War, was immediately suspected as the murderer. He had given the girl an engagement ring before Christmas, 1953; but she had returned the ring early in February after her father vehemently objected to the marriage and warned them not to meet again.

Shortly after midnight, scarcely an hour after the finding of the body, two policemen went to appellant's home, had him roused from his bed, and told him that he was wanted at the police station at Seat Pleasant for questioning. He accompanied them without protest.

On April 9 an autopsy was performed by Dr. James I. Boyd, Deputy Medical Examiner, who found five gunshot wounds, one in the left hand, one in the abdomen, one in the cheek, and two in the skull. Dr. Boyd also found that the girl had been pregnant between 'three and four months.

At 5:30 p. m. appellant signed a statement in the presence of Detective Sergeants Kearns and Huber, in which

he set up an alibi that he was with three other girls on the previous evening.

Appellant then voluntarily agreed to take a lie detector test, although an attorney, who visited him that afternoon, advised him that he was not required to take such a test. That evening Leonard H. Harrelson, one of the owners of a detective agency in Washington, gave him the test in an office of the police station. During the test appellant told Harrelson that he did not kill the girl. After the test Harrelson told him that the chart showed that he was lying.

Harrelson also showed him the photographs which had been taken of the girl's body on the autopsy table. Shortly after seeing the photographs, appellant told Harrelson and the police officers that he had killed the girl and was willing to make a confession. He began the statement at 9:07 p. m., and it was typed for his signature at 10:45 p. m. After signing the confession in the presence of Sergeants Kearns and Huber, he accompanied the police to 61st Avenue and L Street, where he had hidden the revolver under a cardboard box. After searching in the weeds under the box, the officers found the revolver.

Appellant was indicted for murder by the grand jury of Prince George's County on April 13. On May 4 the Circuit Court for Prince George's County, acting upon his suggestion that he could not obtain a fair and impartial trial in that county and his application for a change of venue, ordered the case removed to the Circuit Court for Howard County for trial. On June 18 he filed a plea of not guilty because of insanity at the time of the commission of the crime.

The case was set for trial on July 12. On July 8 appellant petitioned for a continuance on the ground that he could not obtain a fair and impartial trial by jury at that time. Judge Clark immediately denied the motion, and the trial began as scheduled.

Appellant's father, Bainbridge E. Bryant, a pasteurizer of milk in a Washington dairy, described the serious injuries appellant received in an automobile accident on

July 14, 1952, after his return from Korea. In that accident two of appellant's friends were killed. Mr. Bryant said that his son was taken to Walter Reed Hospital, where he seemed to be in a state of amnesia and could not remember the circumstances of the accident. The hospital records showed that, in addition to several broken bones, appellant sustained a cerebral concussion and had retrograde amnesia for several days. He underwent an operation for a broken bone in his left leg, and was confined to the hospital for several months.

Appellant's mother testified that he had convulsions as a baby and rheumatic fever before he was five years old.

When the State offered appellant's confession in evidence, Sergeant Huber testified: "I told him that he didn't have to talk if he didn't want to, that if he made any statement whatsoever, the statement was made of his own volition without any threats or promises, without any inducements of any kind, and that if he did make that certain kind of a statement, that statement could be used against him in court, if necessary."

Appellant's attorney informed the Court that he had no evidence to show that the confession was not made voluntarily. The confession was thereupon read to the jury. In the Court of Appeals appellant stated that he made no objection to the admission of the confession in evidence.

In this signed confession, appellant stated that on April 8 at about 7:40 p. m. he left his house and drove to Capitol Heights, and saw Joan walking along the street. He stopped his car and asked her to get in with him, but she refused. He then stated:

"So I left and went up to F Street and parked my car and I walked down 49th Avenue to meet her. I walked all the way down to the bottom of the hill, where I met her. * * * When we got to the spot where the shooting took place, she told me that she did not want to walk any farther with me, as she was afraid that her father or brother might see us. * * * I told her that I

wanted her to go with me now so that I could talk with her. Then she said 'No,' and started to holler, and I took her by the arm, and I pulled this gun out of my back pocket and told her to come on with me, and she reached out with her hand and grabbed the gun. I had the hammer back on the gun and it went off and I kept on pulling the trigger. She fell and I walked over to where she was laying, knelt down beside her and I tried to pick her up. * * * I stood there for a few minutes. * * * I then walked up to my car, drove up 57th Avenue, and turned down L Street, where I went up in the woods and hid the gun. Then I went back up the road and picked up three girls on 57th Avenue, drove them around for about an hour, took them home, then went home myself."

In reply to a question of the police, appellant said that he stole the revolver because he had one in the army and he always wanted one. He also made the reply that he picked up the three girls because he figured that he would get caught and this would be the last time he would be with some girls, and he also figured that they could be used as an alibi.

Upon taking the witness stand, appellant testified that while he was in the army he was absent without leave several times, was court-martialed, and was sentenced to the stockade. He stated that on three occasions, while he was in the stockade, he cut his wrist with a razor blade. He declared that he wanted to bleed to death so that he would get out of jail. He was discharged from the army in August, 1953.

Appellant then testified that he became engaged to Joan Ruzza in September, 1953. He also stated that he had frequent sexual intercourse with her during a period of five months, from early in October, 1953, until early in March, 1954.

Appellant further testified that on February 2, 1954, Joan's father ordered her not to see him again; but he

persisted in seeing her. He stated that he lost the job which he had at a department store in Washington, and that he had nothing else to do. Frequently he drove Joan to school. He said: "I'd meet her down at the bottom of the hill where she lived at. * * * Take her to school, sit around, talk, and we ride around until it was time for her to go to school, and I pick her up after school."

Appellant further testified that when he met Joan again on March 7 and 8, she told him that she could not see him any more. On both of those days they had arguments which resulted in his arrest on two charges of assault. He was tried by Magistrate Nita S. Hinman Crane in Upper Marlboro on March 12. He contended that all he did was to "grab her by the arm." However, Miss Crane found him guilty and fined him $10 in each case. Even after those convictions, appellant watched Joan walking to school, and talked with her in a movie theater on April 4.

Appellant further testified that on April 8 he met Joan on the street at about 4:30 p. m. She told him that she was pregnant, and that she wanted to talk with him that evening. He agreed to meet her in a drug store at 7:30. He was determined to see her father and tell him the truth. At about 7:30 he met Joan on the street, and they agreed to meet on 49th Avenue. He parked his car, and took the revolver with him "for two or three reasons," one of which was that he intended to see Joan's father, who had threatened to kill him. When the estranged lovers met on 49th Avenue, appellant warned Joan that he was determined to see her father and force him to consent to their marriage. Joan pleaded with him not to see her father, as she feared that her father would kill him.

Appellant then gave the following account of their final conversation:

> "I was just tired of every time I wanted to see her I had to meet her some place. * * * Well, at the time being, I pulled this gun out of my pocket. She had seen the gun before, because I

showed it to her on March 5th. I stole it on March 3rd or the 4th. * * * I told her the reason I had it, for my protection, and because I just like guns. * * * She jumped back when I pulled that gun out. * * * She asked me what it was for, what I was going to do with it. I told her I was going to take it to go in the house. If Mr. Ruzza wouldn't listen to me, I was going to just sit him down, make him sit down, hear what we had to say, and if he don't want to do it the way I want to do it, I would get your clothes, and we'll go up to my house, and get some money from my mother and father, * * * and then we'd run away tonight and get married. * * * I said, 'We're going to do it this way, or you're going to find yourself another father or husband—I can't remember the exact words—for the baby.' I don't know. After I said that, I can vaguely remember that * * * she reached out and grabbed for the gun. The gun went off. I remember that part. The next thing I actually can remember is when I was riding around with these girls in the car."

## I.

Appellant's first contention was that Judge Clark committed error in denying his petition for a continuance. He alleged that on July 7 he escaped with four other prisoners from the jail in Upper Marlboro, but was recaptured; that the Baltimore and Washington newspapers carried the story with large headlines together with pictures of him handcuffed; that these newspapers circulated in Howard County and it was reasonable to assume that the jurors had read the articles, which would prevent him from obtaining a fair and impartial trial in the immediate future.

When the case came before the Court of Appeals, appellant mentioned that the reports of his escape and recapture were also announced by radio and television. He contended that Judge Clark should have continued the

case until such time as it could be estimated with assurance that the prejudicial effect of the publicity had so far worn off that the trial could proceed free of public preconception of guilt.

It is undeniably a fundamental right of any person charged with crime to have the question of his guilt or innocence determined by a fair and impartial trial according to law. In order that the defense may be considered impartially, the accused is entitled to have the verdict represent solely the effect of the evidence without the influence of popular sentiment, and the jurors should have the opportunity to weigh the evidence calmly without having their minds distracted and dominated by manifestations of public hostility. The existence of such a high state of excitement against a prisoner as would have a tendency to swerve or intimidate the jury, and thus prevent a fair and impartial trial, should entitle him to a continuance until there has been a reasonable time for the excitement to subside.

In *Fountain v. State*, 135 Md. 77, 87, 107 A. 554, 108 A. 473, 5 A. L. R. 908, where a large crowd gathered with the object of lynching the prisoner, the jury found him guilty of rape and the Court sentenced him to be hanged. The Court of Appeals stated that, while it was natural that popular indignation and wrath should have been aroused by the atrocious crime, the law does not tolerate any interference with the right of the humblest citizen to be accorded justice and, when charged with crime, to have the question of his guilt or innocence fairly and impartially determined. The Court further stated that the attempt to forestall the verdict of the jury by lynching, the flight of the prisoner to escape death at the hands of the mob, and the unusual measures taken by the Court to insure his safety when recaptured, all combined to create an atmosphere incompatible with the right of an accused to a fair and impartial trial. It was not probable, the Court said, that the jury could have kept their judgment free from the influence of the demonstrations made against the prisoner in the immediate

neighborhood of the Court in which the trial was being conducted.

However, the legal meaning of "public excitement" is more than the excitement which is a natural consequence of criminal conduct. Moreover, mere opportunity for prejudice does not raise a presumption that prejudice exists. If it did, it would be difficult to obtain a fair jury trial under present-day conditions. As Judge Henderson said in the opinion of this Court in *Baltimore Radio Show v. State*, 193 Md. 300, 330, 67 A. 2d 497, 511, *certiorari* denied, *State v. Baltimore Radio Show*, 338 U. S. 912, 70 S. Ct. 252, 94 L. Ed. 562, "Trials cannot be held in a vacuum, hermetically sealed against rumor and report. If a mere disclosure of the general nature of the evidence relied on would vitiate a subsequent trial, few verdicts could stand."

Thus, in *Grammer v. State*, 203 Md. 200, 209, 100 A. 2d 257, where the prisoner claimed that there was public hysteria over his case, which would prevent him from having a fair and impartial trial by jury, we did not find any hysteria and did not believe that the widespread interest in the case had created such prejudice as to make a fair and impartial trial impossible.

The question of the prejudice of jurors created by stories in the newspapers came before the United States Supreme Court in *Holt v. United States*, 218 U. S. 245, 31 S. Ct. 2, 4, 54 L. Ed. 1021. The accused in that case had been found guilty of murder and had been sentenced to imprisonment for life. He contended that the trial court erred in not sustaining a challenge to one of the jurors. Justice Holmes, in delivering the opinion of the Court, rejected the argument with the following comment:

> "On his examination it appeared that this juryman had not talked with anyone who purported to know about the case of his own knowledge, but that he had taken the newspaper statements for facts; that he had no opinion other than that derived from the papers, and that evidence would change it very easily, although it

would take some evidence to remove it. He stated that if the evidence failed to prove the facts alleged in the newspapers, he would decide according to the evidence or lack of evidence at the trial, and that he thought he could try the case solely upon the evidence fairly and impartially. The finding of the trial court upon the strength of the juryman's opinions and his partiality or impartiality ought not to be set aside by a reviewing court unless the error is manifest, which it is far from being in this case."

In the case at bar appellant suggested that the reports in the newspapers might have given the jury the impression that he broke out of jail because his trial was approaching and he had a guilty conscience. In denying the motion for a continuance, Judge Clark stated: "The defendant has no one to blame for his attempted escape but himself. It was entirely his idea. He cannot use it as a basis for a motion for postponement. * * * As a matter of fact, I do not have the least doubt of the defendant's ability to obtain a fair and impartial trial in this court on Monday, July 12, 1954."

It has long been a rule of practice in Maryland that the granting or refusal of a motion for continuance is within the discretion of the court, and its action on such a motion is not ground for reversal in the absence of anything in the record to show an abuse of discretion. *Harris v. State*, 141 Md. 526, 530, 119 A. 154; *Lee v. State*, 164 Md. 550, 553, 165 A. 614; *Hunter v. State*, 193 Md. 596, 600, 69 A. 2d 505; 2 *Poe, Pleading and Practice*, Tiffany's Ed., sec. 178. As the trial court is in a much better position than the appellate court to determine whether it is proper to continue a case on the ground of public excitement and prejudice, the appellate court will give great weight to the trial court's determination that newspaper publicity of charges against the defendant was not likely to prejudice him at the trial. *Walker v. State*, 136 Ind. 663, 36 N. E. 356; *Delaney v. United States*, 1 Cir., 199 F. 2d 107, 115, 39 A. L. R. 2d 1300. Generally,

the mere fact that excitement has been aroused by the escape and recapture of a prisoner does not make it mandatory that the court shall grant him a continuance, especially if the jail break did not occur in the county where the case is to be tried. *Wright v. State,* 18 Ga. 383.

In this case we have not found that the articles in the newspapers gave any indication of intense public resentment such as there sometimes exists when a woman or child is atrociously raped, or when there is a racial problem that has aroused persistent passion or prejudice among the people. The statements made by the jurors support the view that they obeyed their official oaths. Every juror on the panel, before he was sworn, stated that he had not formed or expressed any opinion as to the guilt or innocence of the accused, and felt that his mind was perfectly free and clear of all prejudice or bias of any kind that might prevent him from rendering a proper verdict.

## II.

Appellant next contended that his attorney should have been allowed to question the jurors on their *voir dire.* Judge Clark announced that he would ask the questions. The clerk thereupon called six members of the panel at a time. They came forward and stood in front of the bench.

The practice of submitting questions to jurors on their *voir dire* has not been uniform in the United States. For example, in Massachusetts prior to 1887 the examination of jurors, beyond the questions expressly provided for by statute, was left to the discretion of the presiding judge. In 1887 the Legislature of Massachusetts directed that, upon motion of either party, the parties or their attorneys, under direction of the court, may examine jurors to learn whether they are related to either party or interested. It was held by the Massachusetts Supreme Judicial Court, however, that the trial court still has the discretionary power to conduct the examination. *Commonwealth v. Poisson,* 157 Mass. 510, 32 N. E. 906; *Commonwealth v. Spencer,* 212 Mass. 438, 99 N. E. 266, 269.

In Florida, on the contrary, there grew up in criminal trials the practice of allowing counsel to conduct the voir dire examination, the trial judges interfering only to correct or supplement the questions. In 1891, however, the Supreme Court of Florida observed in *Pinder v. State*, 27 Fla. 370, 8 So. 837, 839, that there was no statute in Florida "to prohibit the court from exclusively burdening itself with the entirety of such examinations, if it sees proper to do so."

The question as to the proper practice in conducting *voir dire* examinations in Maryland came before the Court of Appeals in 1905 in *Handy v. State*, 101 Md. 39, 60 A. 452. The defendant in that case was charged with the murder of his wife. After the trial court had examined a juror on his *voir dire* and found him to be qualified, the attorneys for the defense stated that they wanted to ask the juror some questions; but the court refused to let them do so, ruling that questions could be suggested to the court and the court would decide whether to ask them. After the defendant was found guilty of murder in the first degree, this Court held that when a juror is sworn on his *voir dire* and is declared by the court to be qualified, counsel for the defendant is not entitled to interrogate the juror generally for the purpose of determining whether or not to exercise the right of peremptory challenge. That rule has been reaffirmed in subsequent decisions, and we see no reason to change it. *Whittemore v. State*, 151 Md. 309, 312, 313, 134 A. 322; *State for Use of Miller v. Welsh*, 160 Md. 542, 154 A. 51; *Lee v. State*, 164 Md. 550, 557, 165 A. 614; *Cohen v. State*, 173 Md. 216, 195 A. 532, 196 A. 819; *Adams v. State*, 200 Md. 133, 140, 88 A. 2d 556, 559.

Judge Clark asked each juror the following questions:

(1) Have you formed or expressed any opinion as to the guilt or innocence of the accused?

(2) Do you feel that your mind is perfectly free and clear of all prejudice or bias of any kind that might prevent you from rendering a proper verdict?

(3) Have any of your close relatives ever been killed or murdered?

(4) Have you any conscientious scruples against inflicting capital punishment?

When the judge found that a proposed juror was qualified, he asked the attorney for the defense if he had any other questions he would like to have asked. The attorney replied that he wanted the Court to ask each juror (1) whether he had ever been a police officer, and (2) whether he had ever been a client of either of the State's Attorneys. The judge asked the first question, but declined to ask the second question.

Appellant further contended that Judge Clark should have asked each juror whether he had ever been a client of either of the State's Attorneys. He suggested that such an association would tend to influence a juror on the side of the State's Attorney rather than on the side of the attorney whom he had never known.

There was no error in the judge's ruling. In Maryland there is no statute or specific rule prescribing the questions which should be asked a proposed juror on his *voir dire* to determine his qualification, but the subject is left largely to the court's discretion. In the exercise of that discretion, the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury. Any circumstances that may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a challenge for cause. Accordingly an examination of a juror on his *voir dire* is proper as long as it is conducted within the right to discover the juror's state of mind in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him. *Corens v. State,* 185 Md. 561, 564, 45 A. 2d 340; *Grossfeld v. Braverman,* 203 Md. 498, 101 A. 2d 824.

### III.

Appellant complained that Judge Clark exhibited an antagonistic attitude toward him and his attorney during the trial. He said that the judge was curt and sar-

castic and that the judge also insinuated that he was impeding the progress of the trial and thus keeping the jurors from their homes. He claimed that the judge's gestures and grimaces and his brusque comments manifested bias, created an atmosphere of resentment, and prejudiced the jury against him, thus depriving him of a fair and impartial trial and denying him due process of law.

Among the remarks from the bench to which appellant specifically objected were those made after the defense attorney requested that the record show that he had been constantly interrupted by counsel for the State. At that point Judge Clark said: "And let the record show that I have admonished you repeatedly about arguing with counsel." The defense attorney then asked the judge the following question: "Will the record show that you are not admonishing the State's counsel?" Judge Clark replied: "Yes, sir, I have admonished the State's counsel too, but they haven't offended quite as much as you have."

Another statement of the Court to which appellant strenuously objected was made at the end of a night session after the defense attorney stated that he resided in Washington and would not have the time to submit any requests for instructions on the following day. The judge thereupon said to him: "Mr. Vogel, this jury is being kept away from their homes, and this thing is becoming quite strenuous to them, and I am doing everything I can possibly do to get this case over with, and if you would co-operate with me, we would have finished long before this, but you have just consistently refused to co-operate with me."

Mr. Vogel asked the judge to explain in what way he had not been co-operative with the Court, and the judge said that he would not have any further argument with him about it, but wanted him to submit requests for instructions on the following morning.

It is a precept of the law that a judge should be impartial and courteous, and should not allow his personal feelings to be exhibited before the jury, but should be

careful in his remarks during the progress of the trial. Attorneys likewise have the duty to conduct themselves properly before the courts, and where an attorney persists in obnoxious actions, the court has the right to rebuke him for such improprieties.

These precepts were illustrated in the case of *Butler v. United States*, 4 Cir., 191 F. 2d 433. In that case the defendant's attorney complained in the United States Court of Appeals that the trial judge had called his objections "capricious, fanciful and foolish," and had warned him that the Court would not allow him to remain in the case unless he refrained from such objections. The Court, in affirming the judgment of conviction, observed that the judge's statement was proper in view of the attorney's conduct.

The trial of the case at bar required four days with night sessions. Judge Clark was of the opinion that the attorney for the defense was too technical and captious in his objections and thereby delayed the progress of the trial. The attorney did not agree with him. The judge was somewhat irritated. The degree of severity of a trial judge's rebukes of an attorney, when the occasions require them, is left to the discretion of the judge as long as they do not prevent a fair and impartial trial. Unless there is some clear showing that the judge's statements influenced the jury against the defendant, the mere fact that the trial was conducted in an impatient and brusque way does not justify a reversal of the judgment. *Apple v. State,* 190 Md. 661, 59 A. 2d 509. The record in this case does not show that the actions and statements of the trial judge prejudiced the jury against appellant so as to deprive him of a fair and impartial trial.

If the accused in a criminal prosecution desires to complain of an alleged impropriety of a remark made by the court during his trial, he should either (1) move to strike it out so as to warn the jury against giving it any effect, or (2) move to withdraw a juror and declare a mistrial because of the prejudicial effect of the remark. *Cohen v. State,* 179 Md. 696, 16 A. 2d 878; *Lubinski v. State,* 180

Md. 1, 9, 22 A. 2d 455; *Brown v. State,* 203 Md. 126, 128, 100 A. 2d 7.

### IV.

Appellant also objected to the introduction in evidence of a certified copy of the docket entries of the court records of Magistrate Crane showing that on March 12, 1954, he had been convicted of two assaults on Joan Ruzza on March 7 and 8.

It is a general rule that evidence is inadmissible in a criminal trial to show that the accused had committed another crime unrelated to the crime charged. The reason for the rule is that such evidence would tend to divert the minds of the jurors from the real question in issue and arouse their prejudices. However, the general rule does not deprive the State of its right to make out its case. If evidence of another crime tends directly to prove the defendant guilty of the crime for which he is being tried, or if the other crime charged is so linked together in point of time or circumstances that one cannot be fully shown without proving the other, regardless of whether the crime incidentally shown is of the same or a different character from the one on trial, the general rule of exclusion does not apply. Where intent is material, the conduct of the accused is relevant to show that intent. Hence, evidence of collateral offenses is admissible, on the trial of the main charge, to prove the intent. To be admissible as relevant, such offenses need not be exactly concurrent. If they are committed within such time, or show such relation to the main charge, as to make connection obvious, such offenses are admissible to show intent. *Wentz v. State,* 159 Md. 161, 150 A. 278; *Callahan v. State,* 174 Md. 47, 197 A. 589; *Wood v. State,* 191 Md. 658, 664, 62 A. 2d 576.

In the case at bar the evidence of the convictions was admissible because it showed appellant's behavior toward the girl whom he killed only a month later, thus tending to show motive and intent.

Appellant also argued that the certified copy of the docket entries of the magistrate's records was not the best

evidence of the convictions. He claimed that the State should have proved the convictions by testimony of the magistrate or the witnesses in the case.

We need not discuss the question further than to say that even where evidence is inadmissible but is admitted over objection, the error is harmless if the same evidence is later admitted without objection. *Damm v. State,* 128 Md. 665, 669, 97 A. 645; *Colie v. State,* 193 Md. 608, 611, 69 A. 2d 497. The record in this case shows that appellant admitted in the Court below that he was convicted by Magistrate Crane on both of the assault charges, and that in one of the cases he pleaded guilty.

V.

Appellant also complained because Magistrate Crane was not permitted to testify as to her recollection of the testimony at the trial of appellant on the assault charges.

It is a generally accepted rule that a party in a criminal action seeking to introduce the testimony of a witness given at a former trial must lay a proper predicate therefor by showing (1) that the witness is unavailable because of his death, insanity, or physical disability preventing his appearance in court, or his absence from the jurisdiction of the court without the connivance of the party seeking to introduce the testimony of such witness, or his absence when after diligent search and inquiry he cannot be found; (2) that such witness testified at the former trial, and the accused was present and had an opportunity for cross-examination; and (3) that the person by whom the testimony of the absent witness is sought to be reproduced will state under oath that he heard, remembers, and can relate the substance of all the testimony of such absent witness, or at least the substance of all such testimony on the particular subject sought to be proved. *Hendrix v. State,* 200 Md. 380, 386, 90 A. 2d 186; *State v. Ortego,* 22 Wash. 2d 552, 157 P. 2d 320, 159 A. L. R. 1232; 2 *Wharton, Criminal Evidence,* 11th Ed., sec. 698.

There are two reasons why Judge Clark did not commit error in this ruling. First, appellant did not specify any

witness whose testimony he wanted Miss Crane to relate, and therefore no proper predicate was established for the admission of her testimony. Secondly, Miss Crane stated that she could only faintly recall the testimony of the witnesses.

## VI.

Appellant's final contention was that he was insane at the time he committed the crime, and therefore he was not criminally responsible for it.

One of the cardinal principles of criminal law is that a person is not criminally responsible for his acts if he is insane at the time of their commission. If a man has a mental disease which destroys his capacity to appreciate rationally the significance of his acts or his responsibility therefor, he is exempt from criminal responsibility. Care should be taken, however, not to confuse such mental disease with mental or moral depravity, or passion arising from anger, hatred, or revenge, for where the act is induced by any of these causes, the perpetrator is accountable to the law.

While in some States particular rules have been adopted as to insane delusions and irresistible impulses, the rule which has been adopted in Maryland, and which has been generally accepted in the United States, for determining the criminal responsibility of a person charged with murder is what is popularly known as the "right and wrong test." The object of this test is to determine the capacity of the accused to distinguish between right and wrong, or, as sometimes stated, to determine the incapacity of the accused to understand the nature and quality of the act, or, if he does know the nature and quality of the act, to know that it is wrong to commit it.

In 1888 the Court of Appeals of Maryland in *Spencer v. State,* 69 Md. 28, 39, 40, 13 A. 809, 814, adopted the right and wrong test, which was formulated by the English House of Lords in 1843 in the celebrated case of *Regina v. McNaghten,* 10 Cl. & Fin. 200, 8 Eng. Rep. 718. Thus it has been the rule in this State that although a person may do an act in itself criminal under the influence

of an insane delusion, with a view of redressing or revenging some supposed grievance or injury, or of promoting some public good, he is nevertheless punishable if he had the capacity to distinguish between right and wrong and knew at the time that he was acting contrary to law.

Chief Judge Alvey said in the opinion of this Court:

"But it is contended that there are other species of insanity than those referable alone to diseases of the mind, or disorders of the mental powers; that there is a species of insanity denominated by medico-legal writers as moral insanity, and sometimes, as lesion of the will; and that such species of insanity may co-exist with ample mental power and perception to distinguish right from wrong, and to understand fully the nature and consequences of criminal acts; and yet the party may be impelled to the doing of an act, wrong in itself, by a morbid irresistible impulse. This species of insanity, it is true, is recognized by many able writers upon medical jurisprudence; and by some few courts it has had a partial or qualified recognition. But, by the great majority of courts and jurists, it is, as an independent state or condition, declared to have no place in the law."

The mental condition of the accused in the case before us was given thorough study by Dr. Manfred S. Guttmacher, Chief Medical Officer of the Supreme Bench of Baltimore City, who has had long experience in psychiatry. Dr. Guttmacher interviewed appellant for three hours and a half. He was also informed by the parents of his illnesses. They told him that he was a person who could not tolerate frustration, and this characteristic was more noticeable after the accident.

Electrical brain wave studies were made of appellant at the Johns Hopkins Hospital. Dr. Curtis Marshall, head of the brain wave laboratory, found that the encephalogram was basically negative, and that some pro-

fuse abnormal waves when the patient was breathing deeply "were due to the fact that the patient had had too little food that day, and could not be considered fairly as evidences of any epileptic type of condition, or anything of that nature."

Dr. Guttmacher also arranged for a series of psychological tests. Appellant's intelligence was measured by the retrobulbar scales. It was found from that test that appellant had an I. Q. of only 77, which put him "on the border line of mental deficiency, that is, in the very dull group." Dr. Guttmacher stated that only about 7 per cent of the general population score as low as this.

The psychologist, who gave appellant the various tests upon Dr. Guttmacher's request, reached the conclusion that appellant is a "basically weak, passive, unstable person, whose defective character appears to have been further disorganized by the effects of organic brain pathology." The psychologist also said that appellant was "never too bright, but was quite normal, and that he is now functioning at a lower level, still not defective, not feeble-minded, but at a lower level than he would ordinarily have functioned."

Dr. Guttmacher testified that, from his interview with appellant and from his study of all the relevant data, he was of the opinion that appellant had the capacity to distinguish between right and wrong and to understand the nature and consequences of his acts. He summarized the psychologist's findings as to appellant's character as follows:

> "He says perhaps the most conspicuous finding with respect to character is this flattening in his emotional responsiveness. At the same time, a tendency towards neurotic impression of such emotion that threatened to intrude into the patient's consciousness. By that, he means that the patient has very little emotional response to things. There's a kind of dullness, a flatness so far as emotional response is concerned. He doesn't feel things very keenly. Now, he tries

to analyze this, and says that this is, in part, he thinks, due to the fact that the patient has a sort of hysterical component in his makeup, so that, if things are too unpleasant, too difficult, for him to tolerate, he can banish them. He can pull the curtain down on them. * * * And he feels that this patient has an emotional flatness which may be part of his basical makeup; but, in addition to that, he has an ability not to let himself get excited or react about certain particular events which he has been responsible for, and which he wants to push out of his mind."

Dr. William W. Elgin, of Towson, Assistant Director of the Sheppard and Enoch Pratt Hospital, who had interviewed appellant in the jail, agreed with Dr. Guttmacher that appellant had the capacity to distinguish between right and wrong. In explaining the basis for his conclusion, Dr. Elgin said: "As the result of my psychiatric valuation, I feel that he showed no evidence of suffering from insanity, or psychosis, or a sufficient degree of mental defect, to regard him as irresponsible."

Dr. Andrew C. Gillis, of Baltimore, who has devoted about 38 years to the study of psychiatry, and who made a detailed examination of appellant, likewise was of the opinion that he knew the difference between right and wrong and the nature and consequences of his act at the time of the murder. In testifying about the significance of attempted suicides, Dr. Gillis said:

"They have to be judged entirely upon their own merits, upon the study of each individual. In some persons, suicide is a sign of insanity. That, of course, is a serious type. In others, it is merely a gesture. It is merely the attempt to perhaps avoid disagreeable duty. In the Army, it is not uncommon, and in the Navy too. In wartime it is not uncommon for service men, who have some very disagreeable duty to perform, and there are many such in wartime, when they feel that they cannot measure up to

it, to attempt so-called suicide, that is, to make a cut on the wrist. That is the most common way of doing things. I have seen it done. Those persons have no intention really of committing suicide, and I believe this boy's attempts at suicide were along that nature. They were not serious attempts at all. It was superficial cuts, and didn't amount to very much."

At the conclusion of the evidence, Judge Clark instructed the jury that if the defendant had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act, they should find him sane at the time he committed the crime, and he was accountable to the criminal law for the consequences of his act.

Judge Clark's instruction was correctly based upon the right and wrong test adopted by this Court. Moreover, in view of the testimony of the psychiatrists who testified in this case, there could be no denial that appellant was sane under the right and wrong test at the time of the commission of the murder.

Appellant earnestly contended, however, that the right and wrong test is not an adequate test for determining the criminal responsibility of an accused person, and he urged this Court to adopt some other test which would be more in conformity with present-day standards of psychiatry.

Appellant called special attention to the *Report of the Royal Commission on Capital Punishment,* 1949-1953, which declared that the right and wrong test is based on "an entirely obsolete and misleading conception of the nature of insanity." He also cited the case of *Durham v. United States,* 214 F. 2d 862, in which the Court of Appeals of the District of Columbia held that the right and wrong test is inadequate. That decision was followed by *Stewart v. United States,* 214 F. 2d 879, where the Court of Appeals held that the District Court's distinction between "mental disease" and "mental disorder" was at least confusing, and remanded the case for a new trial.

In this country it is universally recognized as a salutary doctrine that a decision made on a question presented in a case before an appellate court should not thereafter be lightly modified or abrogated. This doctrine is cherished because it is desirable that the law should be settled as far as possible and not be subject to change because some other judges may think differently. On the other hand, it is true that occasionally it is advisable to make a change in a decision which was wrongly made, provided that it is found that the decision is clearly wrong and contrary to other established principles.

The request made by appellant is not a novel one. Many physicians, psychiatrists, and jurists have criticized the right and wrong test since it was formulated more than a century ago. They have asserted that there are persons who, although having the capacity to distinguish between right and wrong, are nevertheless under the influence of a mental disease, and that the existence of the disease and its effect on the mind and conduct of the patient are facts to be proved, just as much as were the existence and effect of certain other diseases before they became the subjects of common knowledge. Accordingly a number of courts have rejected the right and wrong test, or have admitted an exception in the case of an "irresistible impulse."

However, the Maryland courts for many years have followed the principle that the law is not a medical or metaphysical science, and that its search is for practical rules which may be administered without inhumanity for the security of society by protecting it from crime, and accordingly the court inquires not into the peculiar condition of the mind of the accused, or what mental disorder or weakness he was afflicted with, but solely whether he was capable of having and did have a criminal intent. We repeat the statement which we made recently in *Thomas v. State*, 206 Md. 575, 112 A. 2d 913, 919, that we will not change the right and wrong test unless we are convinced that it is not the proper test. In the present case there was no evidence to show a lack of criminal

responsibility even under the rule in *Durham v. United States*, 214 F. 2d 862.

For the reasons above given, the judgment of conviction must be affirmed.

*Judgment affirmed.*