718 A.2d 588

James Othel WYNN

v.

STATE of Maryland.

No. 90, Sept. Term , 1997.

Court of Appeals of Maryland.

Oct. 5, 1998.

Gina M. Serra, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Emmet Davitt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

As early as 1892, the Supreme Court of the United States, in *Boyd v. United States,* 142 U.S. 450, 12 S.Ct. 292, 294, 35 L.Ed. 1077 (1892), reversed a criminal conviction because evidence of other crimes had been admitted improperly. The Supreme Court stated:

> The principal assignments of error relate to the admission, against the objection of the defendants, of evidence as to several robberies committed prior to the day when Dansby was shot, and which, or some of which at least, had no necessary connection with, and did not in the slightest degree elucidate, the issue before the jury, namely, whether the defendants murdered John Dansby on the occasion of the conflict at the ferry.... In relation to these matters the witnesses went into details as fully as if the defendants had been upon trial for the robberies.... It is said ... that the facts connected with the robbery ... tended not only to identify Standley and Boyd, but to show that they came to the ferry for the same purpose with which they went to Rigsby's house, namely, to rob and plunder for their joint benefit; and, consequently, that each defendant was responsible for Dansby's death, if it resulted from the prosecution of their felonious purpose to rob.

*Id.* at 454, 12 S.Ct. at 294, 35 L.Ed. 1077. The Supreme Court then quoted the trial court's charge to the jury concerning "other crimes" evidence:

> Now, it becomes necessary for the court to remind you of what figure these other crimes that have been proven cut in the case. This crime of the robbery of Rigsby may be taken into consideration by you in passing upon the question of the identity of the defendants. It is a competent fact for that purpose.... You are not to consider these other crimes as make-weight against the defendants alone. That is to say, you are not to convict the defendants because of the commission of these other crimes.... They are not to influence your minds so as to induce you to more readily convict them than you would convict them if the crimes had not been proven against him.

*Id.* at 456, 12 S.Ct. at 294–95, 35 L.Ed. 1077. The Supreme Court, in recognizing the harm to the defendants from the introduction of other crimes evidence, held:

> If the evidence as to [other] crimes ... had been limited to the robberies of Rigsby and Taylor, it may be, in view of the peculiar circumstances ... and the specific directions by the court ... that the judgment would not be disturbed, although that proof ... went beyond the objects for which it was allowed by the court. But we are constrained to hold that the evidence as to the Brinson, Mode, and Hall robberies was inadmissible for the identification of the defendants, or for any other purpose whatever, and that the injury done the defendants ... was not cured by anything contained in the charge. Whether Standley robbed Brinson and Mode, and whether he and Boyd robbed Hall, were matters wholly apart from the inquiry as to the murder of Dansby. They were collateral to the issue to be tried.... Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death.... [W]e are constrained to hold that ... those rules were not observed at the trial below. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged.

*Id.* at 457–58, 12 S.Ct. at 295, 35 L.Ed. 1077.

The early pronouncements of the Supreme Court and other courts have become refined and known as the other crimes evidence rule. In Maryland, it is a rule of exclusion that recognizes the general exclusion of other crimes evidence with a group of stated, but not exhaustive, exceptions.[1] Over time

---

1. In *Harris v. State,* 324 Md. 490, 494–95, 597 A.2d 956, 959 (1991), "[w]e ... re-examined the principles governing admissibility of evi-

the other crimes evidence rule has become embodied in the federal rules and the rules of many states and the case law of the respective jurisdictions.

In our jurisdiction, it is found in Maryland Rule 5–404(b), which excludes from introduction at trial evidence of other crimes, wrongs, or bad acts to prove the character of the defendant in order to show that he or she acted in conformity with that character with regard to the offense with which he or she is charged. There are, however, exceptions to this general rule of exclusion. Evidence of other crimes or bad acts may be admitted for other purposes, "such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Md. Rule 5–404(b). In this opinion, we shall address whether during a housebreaking and theft trial, the introduction of evidence that the defendant committed another housebreaking and theft came within the absence of mistake exception to the general rule prohibiting the introduction of "other crimes" evidence.

## I.

James Othel Wynn, petitioner, was charged in the Circuit Court for Montgomery County with two counts of first degree burglary, nine counts of daytime housebreaking, and twelve counts of theft. The State declined to prosecute a number of these charges. The charges and counts that went to trial were as follows: (1) Count I, first degree burglary as to the dwelling of Donovan Picard; (2) Count II, theft of property belonging to Donovan Picard; (3) Count III, first degree burglary as to the dwelling of James Smith; (4) Count IV, theft of property belonging to James Smith; (5) Count V, daytime housebreaking as to the dwelling of Michael Quigley; (6) Count VI, theft of property belonging to Michael Quigley;

---

dence of other bad acts and ... considered the current legal literature discussing the 'inclusionary' and 'exclusionary' approaches to the problem.... [W]e conclude[d] that continued adherence to the 'exclusionary' approach is appropriate."

(7) Count VII, daytime housebreaking as to the dwelling of Houston Maples; (8) Count VIII, theft of property belonging to Houston Maples; (9) Count IX, daytime housebreaking as to the dwelling of Charles Garrison; and (10) Count X, theft of property belonging to Charles Garrison.

Petitioner was tried on counts one through four, the Picard and Smith charges, on April 29–30, 1996, and May 1, 1996. The State did not present "other crimes" evidence in this trial under the "absence of mistake" exception, and petitioner was acquitted of these charges. Petitioner was tried on counts seven through ten, the Maples and Garrison charges, on May 29–31, 1996. According to statements made by the trial judge in the instant case, but not otherwise supported by the record before us, the State was permitted to present "other crimes" evidence in this second trial under the "absence of mistake" exception. The State apparently presented evidence that petitioner committed a housebreaking of the Quigley home in order to counter testimony or other evidence that petitioner had been seen at a flea market, the same reason the State later proffered for the admission of similar other crimes evidence in the instant case. Petitioner was convicted of the Maples and Garrison charges, although these convictions later were reversed by the Court of Special Appeals.

On September 23–26, 1996, petitioner was tried on counts five and six, the Quigley charges. Consistent with its actions in the second trial, the trial court permitted the State, over objection, to present "other crimes" evidence in this third trial. Again, petitioner was convicted of these charges. In other words, when "other crimes" evidence was not introduced, petitioner was acquitted. When it was admitted, he was convicted. Only the trial on the Quigley charges is relevant to this appeal.

Prior to trial on the Quigley charges, petitioner moved in *limine* to exclude evidence concerning the housebreakings of the Maples and Garrison residences. Before petitioner was afforded an opportunity to present argument in support of his motion, the trial court called upon the State to present its

reasons for admissibility of the other crimes evidence. The State proffered only that this evidence was admissible because it came within an exception to the general rule of exclusion of evidence of other crimes because it was "relevant to the issue of the absence of mistake." The State asserted that the evidence was admissible under the absence of mistake exception because "the issue of innocent possession of these items ... has been generated." Petitioner argued that the evidence of the housebreakings of the Maples and Garrison residences was not admissible because it did not come within the absence of mistake exception.

The trial court, commenting that "absence of mistake really is a key issue in this case," ruled that the State could admit the evidence of housebreaking of the Garrison residence, but not the Maples residence. In clarifying its ruling, the court stated: "I think what the other crimes evidence is that ... there was a break-in, these things were taken, they were found at his place. That I will allow." [2]

At the Quigley trial, Charles Garrison was called to testify for the State regarding the housebreaking and theft that took place at his home. At this point, no defense had yet been presented by Wynn and thus there was nothing to rebut. Before Mr. Garrison described that housebreaking and theft, petitioner's counsel objected. The court, overruling the objection, again noted that the evidence concerning the housebreaking and theft was admissible because it showed, in the trial court's view, an absence of mistake. It then gave the jury a cautionary instruction in which the trial court stated that the evidence was being admitted only to show an absence of mistake. [3]

---

**2.** The dissent in footnote eight describes the instructions the trial court furnished the jury in respect to the testimony of Garrison. This was during the State's case in chief prior to the presentation of the defense.

**3.** When the State presented the other crimes evidence, no defense had been presented. The State and the trial court relied upon the defense asserted in the other trials. In other words, the State presented

Petitioner appealed his convictions of the Maples and Garrison charges as well as the Quigley charges to the Court of Special Appeals. That court reversed the convictions as to the Maples and Garrison charges in *Wynn v. State,* 117 Md.App. 133, 147, 699 A.2d 512, 518–19 (1997), holding that the trial court erred in joining the Maples and Garrison offenses for trial. As to the introduction of the evidence of the Garrison housebreaking and theft at the Quigley trial, the Court of Special Appeals held that the evidence fell within the absence of mistake exception provided in Maryland Rule 5–404(b). It stated:

In the trial in the instant case, appellant [Wynn] argued that he came into possession of that stolen merchandise by mistake; he claimed to have innocently purchased it at a flea market. Carvelas Sellers, a defense witness, testified that she saw appellant at a flea market with several bags of merchandise. Furthermore, appellant extensively questioned Garrison and Maples as to whether the items taken from their houses were unique or simply mass produced. Finally, during closing arguments, appellant argued that he innocently purchased at a flea market the items that were seized from his house. Because appellant argued a defense of mistake or accident, evidence of prior similar acts was admissible to show lack of mistake or accident.

*Id.* at 150, 699 A.2d at 520.[4]

We granted a writ of certiorari to address whether "the Court of Special Appeals misconstrued the 'absence of mis-

---

absence of mistake evidence prior to any assertion of mistake by petitioner *in the Quigley trial.*

**4.** The Court of Special Appeals discussed at length the case of *Emory v. State,* 101 Md.App. 585, 647 A.2d 1243 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). *Emory* relied in part on *Anaweck v. State,* 63 Md.App. 239, 492 A.2d 658, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985). In *Anaweck,* the Court of Special Appeals held that under the absence of mistake exception, evidence of other crimes could be introduced against a defendant in order to show that the State did not make a mistake in charging the defendant. It stated: "Without [the evidence], a mistake could conceivably have been made in charging

take' exception in upholding the admission of 'other crimes evidence[.]' " Under the circumstances here present, we hold that the evidence of the other housebreaking and theft was not admissible under the absence of mistake exception found in Maryland Rule 5–404(b).

## II.

Maryland Rule 5–404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

We have said that this rule means that evidence that the defendant committed other crimes or bad acts is not admissible unless it has special relevance—that it "is substantially relevant to some contested issue and is not offered simply to prove criminal character." *State v. Taylor*, 347 Md. 363, 368, 701 A.2d 389, 392 (1997).[5] Evidence has special relevance if it shows notice, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident. Other

---

Edward Anaweck...." *Id.* at 258, 492 A.2d at 668. To the extent *Anaweck*'s discussion of the absence of mistake exception conflicts with the holding in this case, it is overruled.

**5.** *Taylor*, a child abuse case, primarily involved the malice and intent exceptions to rule 5–404(b). On occasion, the word mistake was mentioned in the majority opinion: once, as an assertion made by the State, and twice it was mentioned by the Court apparently because of its presentation in the State's brief. The majority opinion clearly was based primarily on intent and malice. We said initially, "several of our prior cases ... have recognized the relevance of intent and malice in child abuse cases. Intent and malice can be critical in distinguishing permissible parental corporal punishment from criminal child abuse." *Taylor*, 347 Md. at 370, 701 A.2d at 392. Later, we noted, "[l]ack of intent or malice was a contention of the defense in the instant case." *Id.* at 372, 701 A.2d at 394. "Intent to cause physical injury and malice were important elements of the State's case." *Id.* at 372–73, 701 A.2d at 394. We affirmed the allowance of other crimes evidence in *Taylor* under the intent and malice exceptions.

crimes evidence also may be admitted "if the crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other." *Taylor,* 347 Md. at 369, 701 A.2d at 392 (citing *Bryant v. State,* 207 Md. 565, 586, 115 A.2d 502, 511 (1955)). This list of exceptions to the general rule of exclusion of other crimes evidence, however, is not exhaustive. *Harris v. State,* 324 Md. 490, 501, 597 A.2d 956, 962 (1991).

The rationale underlying the exclusion of other crimes evidence is that a jury, confronted with evidence that a defendant committed another crime, may utilize improperly the evidence to conclude that the defendant is a "bad person" and, therefore, should be convicted of the charges for which he is on trial. *Taylor,* 347 Md. at 369, 701 A.2d at 392; *Harris,* 324 Md. at 496, 597 A.2d at 960; *Ross v. State,* 276 Md. 664, 669, 350 A.2d 680, 684 (1976). In *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896, 898 (1989), we set forth the three-step analysis a trial court must undertake to determine whether the admission of evidence of another crime is appropriate. We stated:

> [The trial court] first determines whether the evidence fits within one or more of the *Ross* exceptions [, essentially the exceptions now found in Rule 5–404(b) ]. That is a legal determination and does not involve any exercise of discretion.
>
> If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence. [The appellate court] will review this decision to determine whether the evidence was sufficient to support the trial judge's finding.
>
> If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission. This segment of the analysis implicates the exercise of the trial court's discretion.

*Id.* (citations omitted); *see also Conyers v. State,* 345 Md. 525, 550–51, 693 A.2d 781, 793 (1997).

██ In other crimes evidence issues, as to whether a matter fits within an exception in the first instance, we extend no deference to a trial court's decision. Initially, courts should exclude other crimes evidence. Only if it fits within an exception will this type of evidence be admissible and, even then, the defendant's involvement must be established by clear and convincing evidence and the probative value and prejudicial effect balanced.[6]

## III.

Petitioner attacks all three of the *Faulker* determinations made by the trial court below. He asserts the evidentiary ruling on the other crimes evidence was in error "because the evidence did not fit within the "absence of mistake" exception or any other exception, ... [his] involvement was not established by clear and convincing evidence, and the probative value, if any, of the evidence was outweighed by its prejudicial effect."

The State contends evidence of the other burglaries was relevant to the trial below to show absence of mistake. Specifically, the State argues that "the central issue in the case is

---

**6.** The dissent relies in part, as we view it, on the third step of the *Faulkner* analysis. The dissent states: "Even if I agreed ... that evidence of Wynn's guilt with respect to the break-in at the Garrison home was not admissible under the "absence of mistake" exception ..., I would nonetheless conclude that the evidence was admissible because of its strong probative value in rebutting Wynn's claim that he innocently acquired the goods stolen from the Quigley home." *Wynn v. State,* 351 Md. 307, 335, 718 A.2d 588, 602 (1998)(dissent). As we understand it, if "other crimes" evidence is offered under the absence of mistake exception and is found to be inadmissible, the matter is over; a probative value assessment is not made. Maryland Rule 5–404(b) almost always relates to evidence believed to be relevant and probative by the party offering it. If it were not relevant or probative, it would be inadmissible for that reason alone. *See* Md. Rule 5–402. The dissent's reliance on relevance as a direct exception to the rule, rather than as the third step in the analysis, emasculates the rule.

whether [petitioner was] in possession of the stolen property because he was the thief or [was] in possession of the stolen property because he 'accidentally' or 'mistakenly' purchased stolen property at a flea market." The State goes on: "Clearly, then, [petitioner's] possession of stolen property from a totally separate break-in *is relevant in determining whether he stole the property from the residences* and did, therefore, intentionally possess it with knowledge of its stolen character rather than innocently acquired stolen property from the flea market." (Emphasis added.)

■ The State also argues that the evidence was admissible to show intent or some other issue substantially relevant to this case. Because, however, the State only asserted at trial that the other crimes evidence was admissible to show absence of mistake, the trial court based its ruling upon that exception and the absence of mistake exception is the only exception discussed in Wynn's petition for writ of certiorari, we need not determine whether any other exception is applicable. *See* Md. Rule 8–131(b).[7]

■ We *noted the nature of our certiorari jurisdiction*, distinguishing it from direct appeal jurisdiction, in *Robeson v. State,* 285 Md. 498, 501–03, 403 A.2d 1221, 1222–24 (1979), where we stated:

The defendant petitioned this Court for a writ of certiorari, raising solely the question of whether the trial court erred in admitting evidence of his pre-arrest silence. The

---

7. As we have stated, this was the third of Wynn's trials presided over by the same trial judge. The first, without the admission of other crimes evidence, resulted in an acquittal. The second, with other crimes evidence admitted, resulted in a conviction, but in a subsequent reversal by the Court of Special Appeals. The dissent relies in large part on what the trial judge discovered from the two prior trials of petitioner. We note, as we indicate elsewhere, that at the inception of the motion *in limine* hearing, the trial court turned first to the State and received from the State its averment that the evidence was admissible under the "absence of mistake" exception. At that time, petitioner did not present that it was going to assert such a defense. The trial court made its decision to admit the evidence based upon what had taken place in the prior cases.

State filed an answer and conditional cross-petition for a writ of certiorari, arguing that certiorari should be denied because the testimony was clearly admissible and, even if not admissible, the error was harmless. The State requested that, if the defendant's petition were granted, we should grant the State's conditional cross-petition to consider the harmless error question. The defendant then filed a motion ne recipiatur, requesting that we not receive that portion of the State's response constituting a conditional cross-petition raising the issue of harmless error. The defendant pointed out that neither side had raised the harmless error issue in the Court of Special Appeals and that court had not considered the issue sua sponte. The defendant contended that it would be improper for this Court on certiorari to consider a question that had never previously been raised in a case. We granted both the petition and the conditional cross-petition, and we deferred ruling on the motion ne recipiatur.

. . . .

We recognize that this Court will not ordinarily consider an issue which was not raised in the petition for a writ of certiorari, in a cross-petition or in the Court's order granting certiorari. Moreover, in some of these cases, we applied this principle and refused to consider an argument that the decision of the trial court should be affirmed on a ground not raised in the petition, a cross-petition or the Court's order granting certiorari. And with respect to the question of harmless error specifically, we stated in *Coleman v. State, supra,* 281 Md. at 547[, 380 A.2d at 55]: "The State did not, however, file a cross-petition for certiorari raising the harmless error issue, and we therefore will not consider it."

In arguing that we should not consider the matter of harmless error in the present case, the defendant relies upon several of the above-cited cases. Nevertheless, such reliance is obviously misplaced. *In all of those cases, there was a failure to raise the issue in the petition for certiorari or in the cross-petition. In the case at bar, the State did*

*raise the harmless error question in a conditional cross-petition, and we granted the cross-petition.*

The principle that a court exercising discretionary certiorari jurisdiction will ordinarily consider only those issues presented in the certiorari petition, a cross-petition or the court's order granting certiorari, is based upon the nature of such discretionary jurisdiction. As observed in *Walston v. Sun Cab Co., supra,* 267 Md. at 569[, 298 A.2d at 397], "the statute [delineating this Court's certiorari jurisdiction] contemplated that the desirability and public interest involved in granting certiorari are shown to us by petition and the matters presented to us by petition should logically be those considered by us unless we limit those matters for consideration in our order granting certiorari." However, as further pointed out in *Walston, id.* at 567–568, [298 A.2d at 396]: "In short, we have treated the [certiorari] procedure as affording a discretionary appeal; and when the discretion to grant the petition is exercised, the case is treated like every other *appeal.*" Since the State presented the harmless error issue to us in a cross-petition, and as we exercised our discretion to grant the cross-petition, with regard to that issue "the case is treated like every other appeal." [Some emphasis added; some brackets in original.]

In *State v. Lancaster,* 332 Md. 385, 402 n. 12, 631 A.2d at 453, 462 n. 12 (1993), this Court again noted the applicability of the *Robeson* line of cases in instances of direct appeals as opposed to the this Court's exercise of certiorari jurisdiction, as occurred in the case at bar:

[The] dissent, in footnote 2, asserts that, in affirming the trial judge, this "Court should not be limited solely to the reasons argued by the State," citing *Robeson v. State,* 285 Md. 498, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). This assertion would be accurate with respect to a case not decided by an intermediate appellate court. In a direct appeal, an appellate court will affirm the trial court's decision on a ground adequately supported by the record although the ground was not relied upon by the trial court or the parties. *See,*

*e.g., Offutt v. Montgomery Co[unty] Bd. of Ed[uc.],* 285 Md. 557, 563 n. 3, 404 A.2d 281, 285 n. 3 (1979); *Robeson v. State, supra.* Nevertheless, as pointed out in both the *Offutt* and the *Robeson* opinions, there is a distinction between a direct appeal and a second discretionary appeal with regard to the principle relied on.... In a case before us which has been decided by the Court of Special Appeals, the principle that a trial court will be affirmed for any reason adequately shown by the record is applicable only if the ground was presented in a petition for a writ of certiorari, in a cross-petition, or in this Court's order granting certiorari. *See, e.g., Robeson v. State, supra,* 285 Md. at 502, 403 A.2d at 1223–1224; *Maryland State Police v. Zeigler,* 330 Md. 540, 562–563, 625 A.2d 914, 925 (1993); Maryland Rule 8–131(b). None of the three arguments made in the dissenting opinions was raised in the State's petition for a writ of certiorari or in our order granting the petition.

In a more recent case, *State v. Broberg,* 342 Md. 544, 677 A.2d 602 (1996), there was a point of disagreement between the majority and the dissenting opinions with respect to whether an issue had been presented sufficiently in either the petition for certiorari, any cross-petition, or in our grant of certiorari. There was, however, no dispute as to the scope of our certiorari jurisdiction. The dissent in that case stated the applicable scope of review when a court is exercising certiorari jurisdiction.

[I]n criminal cases decided by the Court of Special Appeals, where an issue has been put forth as an alternative basis for upholding the conviction, this Court has consistently refused to consider that issue if it was not raised in a certiorari petition, a cross-petition, or the order of this Court granting the petition....

Rule 8–131(b) does state that this Court "ordinarily" will consider only an issue raised in a certiorari petition, a cross-petition, or an order of this Court. The word "ordinarily" does indicate that there are exceptions. Nevertheless, neither the use of the word "ordinarily" in Rule 8–131(b) nor

the principle embodied in the rule, has been treated as granting a general discretion to reach an issue whenever the Court so desires in the interests of "fairness." If it did, the amendment to Rule 8–131(b), adopting an express exception for the "harmless error" issue, would have been unnecessary. Instead, we have held that the "exceptions" to the principle embodied in Rule 8–131(b) are limited to "extraordinary circumstances." *Mazor v. State Dep't of Correction,* 279 Md. 355, 370–371 n. 8, 369 A.2d 82, 92 n. 8 (1977); *Dempsey v. State,* supra, 277 Md. at 142, 355 A.2d at 459[;] *Walston v. Sun Cab Co.,* supra, 267 Md. at 569, 298 A.2d at 397.

*Broberg,* 342 Md. at 573, 677 A.2d at 616 (dissent)(footnotes omitted).

In the case *sub judice,* the only question presented in Wynn's petition for certiorari was narrow: "Did the Court of Special Appeals misconstrue the 'absence of mistake' exception in upholding the admission of 'other crimes' evidence?" The State did not file a cross-appeal. Moreover, in its response, the State acknowledged the limitations of the question presented, by stating:

The fact, however, that Wynn did not testify and thus did not expressly assert a defense of mistake or accident should not prevent the use of the "other crimes" evidence. Whether Wynn was mistakenly or accidentally in possession of stolen property from which it was inferred that he burglarized certain homes was a central issue in this case. Thus, the use of the "other crimes" evidence was substantially relevant to demonstrate an absence of mistake. [Citation omitted.]

At no prior point in this case, either before the trial court, in response to Wynn's petition, or in any cross-petition to this Court did the State present the "intent" exception. Moreover, the State at trial did not proffer that its purpose in offering the testimony of Garrison as to the housebreaking at his residence and the theft of his property was to address Wynn's state of mind. Its purpose in presenting the testimony in its

case in chief, prior to any defense being offered, was to establish where Wynn obtained the property, not his state of mind when he obtained it. Additionally, the State did not, in any forum, present the "doctrine of chances" relied upon extensively in the dissent.[8] We considered the petition, the State's limited response, and granted the writ as presented. In the exercise of our certiorari jurisdiction, we do not perceive any extraordinary facet of this case that leads us to consider an issue not properly presented.

The dissent would put this Court, under the circumstances here present, in the shoes of the trial judge, making for him or her after-the-fact evidentiary rulings on grounds never presented to him or her or relied upon by him or her, because of the better position we are in whenever an appellate court exercises the awesome power of hindsight. In this case, for all of the reasons we have stated, we disagree with the dissent that it is appropriate to do so.

As we have indicated, *supra,* if the other crimes evidence does not fit into the absence of mistake exception, the first step of the *Faulkner* analysis is not satisfied. Because the State limited its argument to the absence of mistake exception at trial and because the absence of mistake exception was the only exception discussed in the petition and response to the petition for certiorari, it is that exception with which we are concerned. Furthermore, it is only in consideration of the expressed reason given by the State, "absence of mistake," that the trial court could have conducted the third step of the *Faulkner* analysis—the balancing of probative value against prejudicial effect. The trial court could not possibly have made a correct balancing of probative value and prejudicial effect based upon the reason given in the dissent as that reason appears there for the first time. Nor could petitioner have argued properly the third step of the *Faulkner* analysis at the trial court level because the reason now relied upon by

---

**8.** This Court has not yet been presented with a "doctrine of chances" case. Because of the limitations of our certiorari jurisdiction, the issue is not properly now before us.

the dissent had not then been presented. Had the State proffered at trial the reason now relied upon by the dissent and the trial court had denied Wynn any opportunity to respond to it, we would no doubt have considered it to have been fundamentally unfair. It would be, in our view, equally unfair for this Court to do as the dissent suggests, *i.e.*, rely on a *Faulkner* first-prong exception never presented below and then balance its probative with its prejudicial effect, without affording any opportunity to the defendant to be heard on that specific exception.[9] We shall, therefore, limit our determination to whether the absence of mistake exception applies under the circumstances of this case.

Commentators and case law generally recognize different factual scenarios within the absence of mistake exception. The case *sub judice* involves a situation in which evidence of other crimes is alleged to be admissible to show that the defendant did not commit the act for which he or she is on trial mistakenly or accidentally. Professor Lynn McLain explains:

> If the defendant admits[10] that he or she took an action, but claims to have done so unintentionally or by mistake, so that allegations of, for example, forgery, fraud, embezzlement, or malice are unfounded, the prosecution may offer evidence of his or her similar prior wrongs, acts, or crimes. This use of the evidence as proof of absence of mistake is merely the obverse of proof of intent.

5 Lynn McLain, Maryland Practice § 404.12 (footnotes omitted). The rule allows the introduction of other crimes evidence "[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge." John W. Strong *ET AL.*, McCormick on Evidence § 190 at 804 (4th ed.1994).

---

9. Were we to address the intent exception, our decision would be unchanged. We do not perceive this to be a proper case for the intent exception to the exclusion of other crimes evidence.

10. Petitioner did not testify at trial.

Another factual scenario involves a situation in which the defendant asserts he or she was not responsible for the act causing the injury and instead claims that the resultant injury was caused by an independent accident. Professor McLain again explains:

> Similarly, the defendant may claim the harm he or she is alleged to have caused was not at his or her hands, but was the result of an independent accident. Evidence of prior similar acts is then admissible to show lack of mistake or accident. For example, if a defendant charged with child abuse contends that the child's injuries were caused by an accidental fall, evidence of prior beatings of the child by the defendant will be admissible.

5 LYNN MCLAIN, MARYLAND PRACTICE § 404.12 (footnote omitted).

Examples of the proper application of the absence of mistake exception demonstrate its non-applicability under the facts of this case. We found limited illustrations of the applicability of the absence of mistake exception in the appellate courts of this State. We shall examine those cases addressing the absence of mistake or accident exception along with the cases of other jurisdictions to illustrate the proper application of this exception.

*Hoes v. State,* 35 Md.App. 61, 368 A.2d 1080, *cert. denied,* 280 Md. 731 (1977), primarily involved the "common plan or scheme" exception. The Court of Special Appeals also examined, however, the absence of mistake or accident exception, because Hoes argued facts that could have constituted a mistake. Hoes admitted "that he had 'throwed up the [shot] gun,' and that 'the gun went off,' but denied 'that he had intended to shoot [the victim].'" *Id.* at 62, 368 A.2d at 1082. In the case *sub judice,* however, we note petitioner never claimed to have entered the Quigley house mistakenly or on purpose. He has always maintained that he did not enter it at all.

Hoes was charged with assault with intent to maim. At his trial, the State elicited testimony from the victim that the

defendant shot her twice in the side four or five years prior to the shooting for which the defendant was on trial. Holding that the evidence was admissible other crimes evidence, the Court of Special Appeals reasoned:

> The relevance of the prior conduct rests upon two things: the similarity of the method of assault and the fact that it was upon the same victim. That he had shot her before in like manner is inferentially relevant to his intent to do so this time, especially in light of his admission that he had discharged the firearm. As the State pointed out, the fact that appellant had shot [the victim] a few years earlier makes it less likely that shooting her this time was an accident or mistake.

*Id.* at 69, 368 A.2d at 1085 (footnote omitted).

A Maryland case demonstrating the non-applicability of the absence of mistake exception is *Emory v. State*, 101 Md.App. 585, 647 A.2d 1243, *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995). In that case, the defendants were charged with drug kingpin conspiracy and other related offenses. At trial, a co-conspirator testified regarding various instances of drug activity involving himself and the defendants over the seventeen-month period during which the defendants were being investigated by the Anne Arundel County Police Department. In addition, the co-conspirator testified regarding other uncharged drug-related activities that spanned over twenty years.

On appeal, the defendants contended that the testimony regarding the uncharged drug activity should have been excluded. Holding that the evidence failed to pass the first prong of the *Faulkner* analysis, the Court of Special Appeals stated relative to the absence of mistake exception: "The [defendants] never argued that their apparent involvement with marijuana was somehow an inadvertent and bizarre mistake. There was, therefore, no claim, proffer, or theory of mistake that needed to be negated." *Id.* at 608, 647 A.2d at 1255.

The Court of Special Appeals in *McKinney v. State*, 82 Md.App. 111, 124, 570 A.2d 360, 366 (1990), considering the absence of mistake or accident exception with respect to a joinder issue, said:

> "[T]he State seized on the absence of mistake 'exception' as justification for the joinder. In so doing, it relies on appellant's rather ambiguous response to a question...."

McKinney had been asked whether he had intentionally improperly touched certain areas of several young girls' bodies. He responded that he had not. He was then asked whether he may have accidently or incidentally touched the girls. He responded: "It's possible. It was very crowded.... There were numbers of people standing in line...."

*Id.*, 570 A.2d at 367. From that testimony, the State fashioned an argument on appeal that McKinney had asserted a defense of accident or accidental touching.

The Court of Special Appeals, in determining whether the evidence of touching of the girls initially would be admissible correctly held: "The combined testimony of the three alleged victims might very well have tended to disprove any defense based on accident or mistake, but since no such defense was asserted, there was no material fact to be established by the other crimes evidence." *Id.* at 125, 570 A.2d at 367.

Jurisdictions outside of Maryland have had the opportunity to address the absence of mistake exception. The case of *State v. Brogan*, 272 Mont. 156, 900 P.2d 284 (1995), decided by the Supreme Court of Montana, exemplifies the proper application of the absence of mistake exception. There, the defendant, Brogan, was the operator of a game farm. A state statute made it a crime to possess wild animals. State officials discovered that the defendant's farm had ten more elk than he had reported on the most recent report to the department. The department then conducted an investigation of the farm, during which the defendant admitted that excess elk were on his farm and that those excess elk were wild. He asserted, however, that the elk must have entered his farm by

mistake when he left the gate of the fence surrounding his farm open in order to lure other wild elk off his farm.

At trial, the state sought to introduce evidence that the defendant had been convicted previously of similar charges. The defendant moved in limine to exclude this evidence, but the trial court denied his motion. The Supreme Court of Montana affirmed the lower court's ruling. It stated: "The State's purpose in introducing the evidence was to establish absence of mistake or accident.... Under the circumstances of this case, the prior acts were relevant to the stated purpose for admitting the evidence." *Id.* at 167, 900 P.2d at 291.

In *Margetts v. State,* 107 Nev. 616, 818 P.2d 392 (1991), the defendant and the victim were both coin dealers attending a coin show. The defendant agreed to purchase coins from the victim with the understanding that the defendant would pay the victim at the end of the show. At the end of the show, the defendant tendered a bad check to the victim. After the defendant failed to pay the debt, he was charged with one count of swindling and one count of obtaining money by false pretenses.

At his trial, the defendant testified, stating that he tendered the bad check by mistake. Another dealer also testified. He stated that he had previously transacted business with the defendant. In that transaction, the defendant bought numerous coins from that dealer and also failed to tender a good check.

Addressing whether the other dealer's testimony came within the absence of mistake exception, the Supreme Court of Nevada stated: "At trial, Margetts testified that he had no intention to swindle Hendrickson, and that he tendered the bad check by mistake. Therefore, he placed his intent at issue, making prior bad act evidence admissible to prove intent, or absence of mistake." *Id.* at 619, 818 P.2d at 394.

In *State v. Crawford,* 329 N.C. 466, 406 S.E.2d 579 (1991), the defendant was charged with various crimes arising out of the death of a six-year-old child. The child, whose mother was dating the defendant, died of "water intoxication" after the

defendant gave him large amounts of water to "flush out [his] system." *Id.* at 475, 406 S.E.2d at 584.

The defendant testified at trial that he gave the child water in order to treat him for what the defendant thought was food poisoning. He stated that on the previous day, the child had eaten sorbet, which the defendant thought resulted in food poisoning. The defendant testified that the purpose of giving the child large amounts of water was not to punish the child but was a " 'mistaken effort to treat him.' " *Id.*

The trial court found that testimony regarding previous instances of the defendant's maltreatment of the child relevant. In particular, the court found testimony regarding prior instances of the defendant's discipline of the child admissible. The Supreme Court of North Carolina affirmed, holding that the testimony came within the absence of mistake exception. *See also People v. Woltz,* 228 Ill.App.3d 670, 170 Ill.Dec. 502, 592 N.E.2d 1182, *cert. denied,* 146 Ill.2d 650, 176 Ill.Dec. 820, 602 N.E.2d 474 (1992) (holding that testimony of a prior victim of sexual abuse was not admissible under the absence of mistake exception when the defendant never claimed that he performed the act for which he was on trial mistakenly, but denied committing it altogether); *State v. Farrell,* 242 Neb. 877, 497 N.W.2d 17 (1993) (holding that in a trial for possession of methamphetamines, evidence that narcotics were discovered in a home owned by the defendant but not resided in with his wife was admissible when he claimed that the shorts he was wearing and in which the methamphetamines were found were also worn by his wife); *State v. Lesnick,* 141 N.H. 121, 677 A.2d 686, 690 (N.H.1996) (admitting evidence that the defendant had stabbed her husband two months prior to the stabbing for which she was on trial to "refute the defendant's claim of mistake or accident as a defense").

 Our examination of the commentators and the case law both in Maryland and in other jurisdictions *that we have discussed* reveals a general prerequisite to the application of the absence of mistake exception. In order for the exception to apply, the defendant generally must make some assertion

or put on a defense that he or she committed the act for which he or she is on trial, but did so by mistake. In those cases noted above in which the exception was found not to apply, the defendant made no assertion or put forward no defense that he or she mistakenly committed the *act for which he or she was on trial.* As we have noted, the State sought to introduce the "other crimes" evidence here at issue to prove not that petitioner had received stolen property, but that he had burglarized the Quigley residence.

Under the circumstances of the case at hand, the absence of mistake exception is not applicable for two reasons. First, petitioner never asserted that he entered the house mistakenly or that the housebreaking was a mistake. To illustrate, petitioner did not assert that he mistakenly entered the Quigley residence and took the items at issue believing that he had a right to do so. Petitioner did not assert that he had stumbled mistakenly into the Quigley premises. Rather, petitioner asserted that he did not commit the acts with which he was charged.

The sole issue in the case was whether petitioner was guilty of stealing property during the course of a housebreaking at the Quigley residence; there was no charge of receiving stolen property, and there was no possibility that whoever broke into the house mistakenly stole the property. In order to admit the other crimes evidence the State may have been creating a straw person by inferring that petitioner claimed he purchased the property at a flea market and that claim was a "mistake." The jury had to determine whether petitioner stole the property or purchased the property not whether, if he purchased the property, he was mistaken in doing so in that it was stolen property. Even had petitioner testified that he purchased the property not having any reason to believe it was stolen or even believing it was stolen, which he did not, the State's theory, as clearly expressed below, was not that he was a receiver of stolen property, but the housebreaker. Under these circumstances, where there is no defense of mistake in reference to the housebreaking and no suggestion that the property might have been mistakenly stolen, believing

he had a right to take it, absence of mistake is irrelevant. It is clear that the only possible inference the jury could have drawn from the other crimes evidence was that if petitioner had property from separate housebreakings, he must have been the housebreaker.

Second, in order for the exception to apply, the crime or bad act allegedly committed by mistake must be the same crime or bad act for which the defendant is on trial. As to the absence of mistake exception, MCCORMICK ON EVIDENCE states that other crimes evidence is admissible "[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge." Even if we were to characterize the State's position as an assertion that petitioner acted mistakenly in purchasing the property at a flea market, this mistake was not the same act for which petitioner was on trial. In the case *sub judice*, the acts for which petitioner was on trial, the housebreaking and theft from the Quigley home, were not the same as the act allegedly done by mistake, the purchase of the property at a flea market.

If petitioner had asserted as a defense that he had permission to enter a house adjacent to the Quigley house in order to remove items therefrom and claimed to have made a mistake in that he entered the wrong house, the State might have been able to introduce evidence that petitioner committed other housebreakings in the same manner to show that petitioner did not act mistakenly by entering, and thus housebreaking, the Quigley house. Under this type of factual scenario, the act alleged by petitioner to have been done mistakenly, the housebreaking, would have been the same as the act for which petitioner was on trial.

As we perceive it, the State's argument is that any time a defendant is found in possession of stolen items and denies that he committed the housebreaking during which the items were stolen, further asserting that he did not know property in his possession was stolen, the State can produce evidence of other housebreakings committed by the defendant under the

absence of mistake exception to the other crimes evidence exclusionary rule. Under this argument, the exception would swallow the rule because virtually any defendant who pleads not guilty to a theft, burglary, or housebreaking charge would be subject to the admission of other crimes evidence under the absence of mistake exception. The exception, under the State's theory, would permit the introduction of other crimes evidence any time allegedly-stolen property is found in a defendant's possession and the defendant asserts his or her right to plead not guilty to the offenses with which he or she is charged. We do not believe that, under any reasonable interpretation of the absence of mistake exception, the exception goes so far.

The other crimes evidence in this case was introduced by the State in its case in chief, prior to the presentation of any defense, to show that petitioner must have been the person who committed the housebreaking and theft in question because he was the person who committed another housebreaking and theft. In other words, petitioner committed the housebreaking and theft because he had a propensity to commit housebreakings and thefts. We have stated on numerous occasions that other crimes evidence may not be introduced for this purpose.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF CONVICTION AS TO THE QUIGLEY COUNTS AND REMAND FOR A NEW TRIAL ON THOSE COUNTS; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

RAKER, J., dissents.

RAKER, Judge, dissenting.

I would affirm the judgment below and accordingly, I dissent. The Court of Special Appeals, in my view, applied the proper analysis. Judge Thieme wrote for the court:

The evidence in the instant case was substantially relevant to a genuinely contested matter in the case. The issue at trial was whether [Wynn] stole the merchandise from the victim's house. He claimed to have come to possess the merchandise by purchasing it at a flea market. Thus, not only was the issue substantially relevant and contested, it was a central issue of the case. From the determination of the theft issue, the housebreaking issue was decided. If [Wynn] had the stolen items, it can be inferred that he was the person that broke into the house. Thus, the issue was critical to the determination of both counts.

*Wynn v. State*, 117 Md.App. 133, 148–49, 699 A.2d 512, 519 (1997) (citation omitted).

The majority holds that the evidence of housebreaking and theft by Wynn at the Garrison residence was not admissible under the absence of mistake exception found in Maryland Rule 5–404(b) and reverses the convictions in this case.[1] I agree with both the trial court and the Court of Special Appeals that the admission of the evidence in question is fitted properly under the "absence of mistake or accident" exception to the general rule of exclusion of other crimes evidence set out in Maryland Rule 5–404(b). Wynn's possession of the goods stolen from the Quigley home, explained throughout his trial defense as the result of an innocent and unknowing purchase, might otherwise be characterized as "unintentional," "mistaken" or even "accidental." It was for the purpose of dispelling Wynn's express claim, and its various possible characterizations, that the trial court rightfully permitted the

---

1. There is no argument presented in this case that the evidence was improperly admitted in the State's case-in-chief, but more properly admitted as State's rebuttal evidence following the defense case. *See State v. Taylor*, 347 Md. 363, 374, 701 A.2d 389, 395 (1997) ("The fact that Taylor did not testify and thus did not expressly state that the injuries were accidental, that he had no malice, and that he had no intent to injure should not prevent the use of the other crimes evidence.") Notwithstanding the majority's reference to the fact that the State introduced this evidence before the defense presented its case, that is clearly not the *ratio decidendi* of the majority opinion nor was it the basis of any objection below.

prosecution to present evidence of Wynn's possession of goods stolen from the other residences. His possession was no mistake or accident.

Even if I agreed with the majority that evidence of Wynn's guilt with respect to the break-in at the Garrison home was not admissible under the "absence of mistake" exception to Rule 5–404(b), I would nonetheless conclude that the evidence was admissible because of its strong probative value in rebutting Wynn's claim that he innocently acquired the goods stolen from the Quigley home. I write to express my disagreement with the analysis applied by the majority regarding the admissibility of the *other crimes evidence in this case. I also* disagree with the majority's conclusion that the theory of relevancy which would justify the admission of the other crimes evidence in this case is not properly before the Court.

## I.

In May of 1995, Montgomery County police detective Eugene A. Curtis, along with other officers, executed a search and seizure warrant at Wynn's apartment in Prince George's County, Maryland. The police seized several items, including three watches and a canvas Sierra bag, identified as having been stolen from the Quigley home. In addition, the police recovered a Lucas gym bag and an antique watch, both identified as having been stolen from the Garrison house. At the Quigley trial, the State introduced the other crimes evidence at issue here: the antique watch and the Lucas bag stolen from the Garrison home.

The majority misunderstands the reason the State offered the other crimes evidence, and applies unsound logic and rationale in concluding that the evidence was inadmissible. The majority states that "examination of the commentators and the case law both in Maryland and in other jurisdictions *that we have discussed* reveals a general prerequisite to the application of the absence of mistake exception." Maj. op. at 330. The prerequisite, as perceived by the majority, is that "[i]n order for the exception to apply, the defendant generally

must make some assertion or put on a defense that he or she committed the act for which he or she is on trial, but did so by mistake." *Id.* The majority concludes that the basic prerequisite to the application of the absence of mistake exception has not been satisfied in this case for two reasons: (1) that petitioner never asserted that he committed the housebreaking or that the housebreaking was a mistake and (2) that the crime or bad act allegedly committed by mistake must be the same crime or bad act as that for which the defendant is on trial. Because the State's evidence did not satisfy these "prerequisites"—that Wynn never asserted that he broke into the Quigley house by mistake and that he was not charged with receiving stolen property—the majority holds that the evidence did not qualify as "absence of mistake," and hence was inadmissible.

The majority concludes that the evidence of theft and housebreaking at the Garrison home was not admissible under Maryland Rule 5–404(b). The majority reasons that "[t]he other crimes evidence in this case was introduced by the State in its case in chief, prior to the presentation of any defense, to show that petitioner must have been the person who committed the housebreaking and theft in question because he was the person who committed another housebreaking and theft. In other words, Petitioner committed the housebreaking and theft because he had a propensity to commit housebreakings and thefts." Maj. op. at 333.

The majority misses the State's theory of the case. Throughout the Quigley trial, the State articulated a tenable, non-character, theory of special relevance for the introduction of other crimes evidence. The State introduced property stolen from the Garrison home to rebut the suggestion by the defense, by showing its improbability, that Wynn innocently bought the Quigley goods at a flea market. The majority is simply wrong in asserting that the evidence was introduced to show the criminal propensity of Petitioner.

Contrary to the suggestion of the majority opinion, the State did not offer the other crimes evidence in this case in

order to place before the jury the impermissible inference arising from Wynn's criminal predisposition. The majority attributes sinister motives to the State, suggesting that "the State may have been creating a straw person by inferring that petitioner claimed he purchased the property at a flea market and that claim was a 'mistake.'" Maj. op. at 331. I disagree with that characterization. Moreover, the record does not support this accusation.

In his first trial, Wynn was acquitted of the Picard and Smith charges; in his second trial, he was convicted of the Maples and Garrison charges. At the second trial, the trial court admitted evidence related to the Quigley housebreaking. The State contended that this evidence was necessary because at Wynn's first trial on the Picard and Smith charges, Wynn argued that "it was the bad luck of the defendant that he had such items in his possession" and that the property was innocently acquired. The State also asserted that the other crimes evidence established identity. Although the trial court found that the evidence did not fit within the identity exception, the court ruled the evidence admissible under the "absence of mistake" exception.

There was no surprise in this case, the third of Petitioner's three trials. Wynn had been indicted in a single indictment, charging multiple housebreakings. The Picard and Smith charges were severed and tried first. The Maples and Garrison charges were tried next. The Quigley case now before us followed. The same judge presided at all these trials. The State's theory of admissibility, and the trial judge's rationale for the admission of the evidence, were well known to the parties at the trial level. It is clear from the record in this case that the trial judge was well aware of the facts related to all the housebreakings and the defenses that were to be presented.[2]

---

2. The majority's repeated assertion that the State presented the other crimes evidence before the defense had been presented and "thus there was nothing to rebut" is out of context and unfair. The lawyers and the

The court held a pre-trial hearing on Wynn's motion to suppress evidence seized pursuant to the search warrant executed at Wynn's apartment; the court also heard a motion *in limine* regarding the other crimes evidence. The trial record is replete with references to the earlier trials and the judge was well aware of Wynn's defense in the earlier trials, as well as his intention to present the same defense at the Quigley trial. At no time did Wynn indicate that his line of defense had changed for this, the third consecutive trial despite the State's clearly expressed intention to use the other crimes evidence under the absence of mistake exception. At a bench conference during Mr. Garrison's testimony, the trial judge, in evaluating whether he should give the jury a limiting instruction regarding the other crimes evidence, explained:

> And I want to make clear that this came up in the second trial. It never came up in the first trial in which the defendant was found not guilty. There was never an issue of other crimes evidence.

---

judge all knew the game plan and, as I have indicated in footnote one, *supra,* Wynn is not challenging the order of proof.

There is sound support for the trial court's consideration of the theory of defense, as manifested before the bench and to the jury, as a factor in determining the admissibility of the defendant's other crimes and bad acts even before his actual presentation of evidence commences. *See United States v. Rhodes,* 779 F.2d 1019, 1031, n. 4 (4th Cir.1985) (In deciding the admissibility of defendant's other crimes, under Federal Rule of Evidence 404(b), "an opening statement ... may be taken into account by the trial court in ascertaining a theory of defense."); *Id.* at 1031 (Defense counsel's cross-examination of government witnesses put in issue the defendant's intent, thereby rendering earlier convictions of the same crime of sufficient probative value to outweigh the prejudicial effect of their admission.); *United States v. Brunson,* 549 F.2d 348, 361 n. 20 (5th Cir.1977) (" '[W]here the government could anticipate the defense testimony because of [a] previous trial which resulted in a hung jury,' it was not error to admit evidence of other crimes to show intent in the government's case in chief." (alteration in original) (quoting *United States v. Adderly,* 529 F.2d 1178, 1182 (5th Cir.1976))); *State v. Kahey,* 436 So.2d 475, 489 (La.1983) (The doctrine of chances rendered evidence of child murder defendants' maltreatment of their other children "substantially relevant to prove that the injuries caused to [the decedent child] were not inadvertent, accidental, unintentional, or without guilty knowledge." (citation omitted)).

It only came up in the second, at a time that I already knew, because I heard the defense in the first trial, what the defendant's central position was. So that is why I ruled the way I ruled, or that was a factor. I am going to give them the instruction.

Finally, at the conclusion of the State's case, Wynn's counsel told the trial court that if Wynn were to testify, Wynn would state that "he did not steal these items but in fact bought them from the Benning Road market." Wynn elected not to testify, presumably because the court ruled that if he did testify, Wynn's prior convictions for theft and housebreaking would be admissible as impeachment evidence. Contrary to the suggestion of the majority opinion, it is clear that the introduction of the other crimes evidence by the State in this case was not an effort to cloak an illicit character theory of admissibility.

Maryland Rule 5–404(b) governs the admissibility of other crimes evidence. The rule is declarative of the common law principle that evidence of other crimes or bad acts may be admitted if that evidence is substantially relevant to some contested issue in the case, and if that evidence is not offered to prove the criminal character of the defendant. *State v. Taylor*, 347 Md. 363, 368, 701 A.2d 389, 392 (1997). Maryland Rule 5–404(b) provides:

> *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

As the use of the phrase "such as" makes clear, the five "exceptions" identified by the plain language of the rule are not exhaustive:

> [A]dmissibility of evidence of other bad acts is not confined to a finite list of exceptions, even under the exclusionary rule.

Evidence of other acts that has sufficient relevance, other than merely by showing criminal character, may be admissible. The so-called exceptions are helpful as classifications of those areas where evidence has most often been found admissible even though it discloses other bad conduct, enabling the bar and bench to quickly focus upon the areas most likely to be involved.

*Harris v. State,* 324 Md. 490, 497–98, 597 A.2d 956, 960 (1991). *See also White v. State,* 290 Ark. 130, 717 S.W.2d 784, 789 (1986) (holding that the listed exceptions are exemplary only and not exhaustive); *State v. Johns,* 301 Or. 535, 725 P.2d 312, 321 (1986) ("[T]he proper inquiry is the probative relationship between the evidence and a fact at issue . . ., not the relationship of the evidence to a categorical list of exceptions.") (internal quotation marks and citation omitted).

We look to the three-prong test articulated in *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989), to determine the admissibility of other crimes evidence. First, evidence of other crimes may be admitted if the evidence is substantially relevant to some contested issue in the case and if the evidence is not offered to prove guilt based on the propensity to commit crimes or to show the bad character of the defendant. *Id.* at 634, 552 A.2d at 897–98. This Court has equated the substantially relevant prong of the tripartite test with a required showing of "special relevance." *Taylor,* 347 Md. at 368, 701 A.2d at 392. Next, the court must find that the defendant's involvement in the other crime(s) has been established by clear and convincing evidence. *Faulkner,* 314 Md. at 634, 552 A.2d at 898. Finally, the trial court must then carefully weigh the necessity for and the probative value of the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 635, 552 A.2d at 898.

### *Special Relevance*

Turning to this case, the evidence established that Wynn was in possession of goods stolen from the Quigley home. Absent a reasonable explanation, the exclusive possession of recently stolen property authorizes the trier of fact to infer

that the possessor is the thief. *Cross v. State,* 282 Md. 468, 480, 386 A.2d 757, 765 (1978). *See Grant v. State,* 318 Md. 672, 680, 569 A.2d 1237, 1241 (1990). Although, theoretically, Wynn could have argued he was not in "possession" of the stolen goods seized from his home, that was not his defense. Instead, he sought to offer an explanation for his possession of the property and to dispel any inference that, as the possessor of the recently stolen goods, he was the thief. Specifically, Wynn's defense was based on the factual premise that he legitimately purchased the property stolen from the Quigley home at a flea market. Wynn did not contest the act of possession. Nor did he contest the allegation that all the property in question was stolen.

Two suppositions follow implicitly from the theory of defense asserted by Wynn. The first is that he did not steal the property from the Quigley home. The second is that Wynn did not have the culpable state of mind alleged by the State when he came into possession of the Quigley goods.

In order to constitute a crime, there must be a concurrence of an individual's act and his or her guilty state of mind, *Garnett v. State,* 332 Md. 571, 577, 632 A.2d 797, 800 (1993), a "coming together of ... an *actus reas* [sic] and a *mens rea.*" *Oates v. State,* 97 Md.App. 180, 185, 627 A.2d 555, 558 (1993). In order to convict Wynn of daytime housebreaking, the State was required to prove that there was a breaking, that there was an entry, that the breaking and entry were into someone else's dwelling, that it was done with the intent to commit a crime inside, and that Wynn was the person who committed the act. *See* MPJI–Cr 4:06.2. In order to convict Wynn of theft, the State was required to prove, in addition to value of the property, that Wynn took and carried away the property of another and that he did so without authorization and with the intent of depriving the owner of the property. *See* MPJI–Cr.4:32.

In seeking to rebut the State's theory of the case and the inference that he was the thief, Wynn defended against the charges in this case by contesting the *actus reus* and the *mens*

*rea* elements. He presented a defense premised upon (1) his non-commission of the act of theft or housebreaking, and (2) his innocent state of mind at the time he came into possession of the property stolen from the Quigley home. As a practical matter, the evidence presented in this case offered the jury two choices: the jury had to choose between the State's theory of the case and Wynn's contradictory theory of defense.[3]

The State sought to discredit Wynn's status as an innocent purchaser by introducing the other crimes evidence. Although Wynn's possession of the property stolen from the Garrison home would have tended to highlight his predisposition for committing criminal acts, that evidence was relevant for a second, legitimate purpose: it logically rebutted Wynn's claim that he innocently possessed the property stolen from the Quigley home. The State was entitled to introduce evidence of the Garrison stolen property to rebut Wynn's innocent explanation for his actions. *See United States v. York,* 933 F.2d 1343, 1350 (7th Cir.1991) ("When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument. Evidence of another crime which tends to undermine defendant's innocent explanations for his act will be admitted.") (internal quotation marks and citation omitted), *cert. denied,* 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991).

The State properly ascertained that the critical issue in this case was the credibility of Wynn's "explanation" as to how he came into possession of the stolen property. If the jury believed that Wynn came into possession of the property innocently, accidently, or mistakenly, because he bought it at a flea market, the permissible inference that arises from the possession of recently stolen property evaporates, as does the State's case. If the jury disbelieved that Wynn innocently

---

**3.** Of course, the jury alternatively could have disbelieved Wynn's exculpatory theory of defense yet still concluded that the State failed to prove its case beyond a reasonable doubt.

bought the property, his possession of the stolen property would have remained unexplained; the jury could then rely on the inference arising from the possession of stolen property to convict.[4]

The theory of relevance underlying the admission of the other crimes evidence in this case is perhaps better, and more intuitively, explained by the doctrine of chances, also known as the "doctrine of objective improbability," a doctrine first articulated by Professor Wigmore, and now recognized generally by courts and commentators. *See, e.g., United States v. Danzey,* 594 F.2d 905, 912 (2nd Cir.1979), *cert. denied sub nom. Gore v. United States,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979); *State v. Crawford,* 458 Mich. 376, 582 N.W.2d 785, 793–95 (1998); *State v. Lough,* 70 Wash.App. 302, 853 P.2d 920, 930–31 (Div. 1 1993), *aff'd,* 125 Wash.2d 847, 889 P.2d 487 (1995). In actuality, the doctrine was recognized by the trial judge, although not articulated as such. *See Crawford,* 582 N.W.2d at 794 n. 11. ("We infer the prosecution's reliance on the doctrine of chances from his opening and closing statements," explaining the relevance of the uncharged

---

**4.** During deliberations the jury sent a note to the court asking whether the jury could acquit Wynn of the theft charge and yet still find him guilty of the housebreaking charge, or vice-versa. Pondering on the record how to answer the jury question, the trial judge focused on the inference arising from the unexplained possession of recently stolen goods. He concluded that because this is a circumstantial evidence case, the jury does not start with the housebreaking, but starts with the inference—the inference they can, but are not required, to find. The trial court reasoned:

In connection with the explanation, whether it is unexplained or explained, that is when they consider the testimony about the Garrison break-in to determine whether or not it is reasonably explained.

If they find that—if they believe that the watch and the bag that was found in his house, they can consider that as to whether there is an explanation. If there is an explanation, then they can't draw the inference. If there is not an explanation, then they can, but are not required to draw the inference that he was the thief, and that is what they have to consider first.

If they find him not guilty of being the thief, then they cannot consider the housebreaking. If they find him guilty of being the thief, then they can, but are not required to find him guilty of the housebreaking. That is the logic of it.

misconduct evidence.) The doctrine of chances is based .on probabilities, and is premised on the proposition that mere coincidence is less probable as the recurrence of similar events increases. *See Westfield Ins. Co. v. Harris,* 134 F.3d 608, 615 (4th Cir.1998) ("[T]he more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous."). Professor Wigmore articulated the doctrine as follows:

> The argument here is purely from the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.

2 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 302, at 241 (Chadbourn rev. ed.1979).

As Professor Imwinkelried explained, "The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea." EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 5:05, at 11 (1995) (footnotes omitted). Professor Imwinkelried also has commented that the doctrine of chances may be used to prove the *actus reus* of a crime. Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove* Mens Rea: *The Doctrines Which Threaten to Engulf the Character Evidence Prohibition,* 51 OHIO ST. L.J. 575, 586–93 (1990). As Dean Wigmore succinctly observed, "In short, similar results do not usually occur through abnormal causes...." WIGMORE, *supra,* § 302, at 241. *See also* Eric D. Lansverk, Comment, *Admission of Evidence of Other Miscon-*

*duct in Washington to Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 WASH. L.REV. 1213, 1225–26 (1986) ("When the evidence reaches such a point, the recurrence of a similar unlawful act tends to negate accident, inadvertence, good faith, or other innocent mental states, and tends to establish by negative inference the presence of criminal intent." (footnote omitted)).

The United States Court of Appeals for the Seventh Circuit applied the doctrine of chances in a more colloquial example: "The man who wins the lottery once is envied; the one who wins it twice is investigated." *York*, 933 F.2d at 1350. In this example, the probative value of the legally permissible inference can be drawn independently of the prohibited inference: the subjective character of the two-time lottery winner. It is the objective implausibility of the occurrence, *sans* nefarious activity, which rebuts the claim of an innocent occurrence. Other courts have similarly applied Wigmore's doctrine of chances in the context of the admissibility of other crimes evidence. *See, e.g., United States v. Queen*, 132 F.3d 991, 996 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1572, 140 L.Ed.2d 805 (1998); *United States v. Robbins*, 340 F.2d 684, 688 (2nd Cir.1965); *Lee v. Hodge*, 180 Ariz. 97, 882 P.2d 408, 412 (1994); *People v. Erving*, 63 Cal.App.4th 652, 661–63, 73 Cal.Rptr.2d 815, 821–22 (1998); *State v. Kahey*, 436 So.2d 475, 488 (La.1983); *People v. VanderVliet*, 444 Mich. 52, 508 N.W.2d 114, 128 n. 35 (1993); *State v. Sadowski*, 247 Mont. 63, 805 P.2d 537, 542–43 (1991); *In re Estate of Brandon*, 55 N.Y.2d 206, 448 N.Y.S.2d 436, 433 N.E.2d 501, 504 (1982); *Johns*, 725 P.2d at 322–23; *Morgan v. State*, 692 S.W.2d 877, 881 (Tex.Crim.App.1985).

In this case, the State was required to prove that Wynn was the housebreaker and the thief, and that Wynn wrongfully came into possession of the property. Conversely, Wynn set forth a theory of defense that he did not commit the criminal act, as well as a theory predicated upon an innocent state of mind (that he purchased the property "in good faith" at a flea market). Wynn's possession of the antique watch and the

Lucas bag stolen from the Garrison home was offered by the State to prove that Wynn's claim of innocent possession of the goods stolen from the Quigley home was not worthy of belief.

It was in support of this inference of improbability that the State sought to introduce the other crimes evidence in this case. If believed by the jury, this intermediate inference permissibly tended to establish an ultimate fact at issue in this case; *i.e.*, the circumstances by which Wynn came into possession of the goods stolen from the Quigley home. In this regard, Professor Imwinkelried recognized that, in a similar scenario, other crimes evidence is admissible to rebut a defendant's innocent state of mind defense:

> The accused may admit that he performed the *actus reus* but claim that he did so with an innocent state of mind. For example, the accused may concede that he had possession of a contraband drug but deny that he knew that the substance was an illegal drug; he might testify that he thought that the substance was lawful medicine. Or an accused might admit that he received stolen property but defend on the theory that he was unaware that the property was stolen. In this context, when the accused characterizes the conduct as "accidental," the accused means that he performed the act without the required *mens rea.*
>
> Just as the government may offer evidence of the accused's other crimes to disprove "accident" in the first sense, the prosecutor may attempt to introduce uncharged misconduct evidence to negate "accident" in the second sense.

Imwinkelried, *supra*, 51 Oʜɪᴏ Sᴛ. L.J. 575, 593–94 (1990) (footnotes omitted). Because the State introduced the Garrison break-in evidence for a purpose other than to establish bad character or propensity to commit crimes, the other crimes evidence satisfies the first prong of the three-part test for admissibility under Maryland Rule 5–404(b).

Although the majority opinion states that Wynn had to admit breaking into the Quigley house for the other crimes evidence to be admissible, an exception to Rule 5–404(b) was

properly triggered when the defendant went beyond merely denying culpability and actually presented a claim of contrary intent. The defendant need not testify to trigger the exception. The Supreme Court of Indiana, discussing the narrow construction of the intent exception in Indiana Rule of Evidence 404(b), stated:

> When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense.

*Wickizer v. State*, 626 N.E.2d 795, 799 (Ind.1993). In the present case, all parties knew that Wynn's defense was that he was an innocent purchaser of the goods at a flea market. Thus, Wynn's state of mind was a contested issue in the case, and the proper foundation existed for the admission of the other crimes evidence.

### *Clear and Convincing Evidence*

Before the Court of Special Appeals, Wynn did not argue that the trial judge erred in finding by clear and convincing evidence that Wynn had stolen the goods from the Garrison home. Before this Court, however, Wynn argues that the intermediate appellate court's reversal of Wynn's convictions for the break-in at the Garrison home renders erroneous the trial court's initial finding of Wynn's complicity in the Garrison break-in. Specifically, Wynn argues that the trial court's initial finding as to the Garrison crimes "was based, in part, on the jury verdict finding Petitioner guilty of breaking into the Garrison home and taking property from Garrison."

Wynn misinterprets the trial court's ruling. Because the plain language of trial court's ruling on the motion establishes that the judge concluded independently that Wynn's complicity in the Garrison break-in was established by clear and convincing evidence, I set forth that ruling in some detail:

THE COURT: I have to be satisfied by clear and convincing evidence that this evidence—that [Wynn] really did—that this property . . . he had belonged to somebody else. I am going to tell you that I come down different places on the watch and the bag as opposed to the camera,[5] I think.

Because the watch and the bag, the watch is an unusual watch, a very unusual watch.

[DEFENSE COUNSEL]: You should understand in your analysis that it would appear that the jury rejected [Garrison] as being the owner of that watch because they found theft under $300.

\* \* \* \* \* \*

THE COURT: Let me say I remember the testimony very clearly about the watch and the bag. The watch is the key instrument for me in this case.

The camera, on the other hand, the way he identified it was it was like his camera and he identified it from the bag, from the camera case. . . .

I have some real difficulties of finding clear and convincing on the camera because the serial number was scratched off. We really don't know what the serial number of it is. It was enough to go to the jury in that case and they found beyond a reasonable doubt, which they can find.

[W]hen you put the watch and the bag together, I think that that watch and the bag came out of the house together.

I know what the jury found. But this is a different test—this is my test. And I don't—by ruling the way I am going to rule now, I don't for a moment say that this puts me in a position of stating in any way that the jury was inappropriate in finding what they found.

---

5. During the course of the ruling, the court also considered and rejected the State's request to offer evidence of Wynn's alleged theft of a camera, from a third home, as other crimes evidence.

There was evidence in which they could find that. It is a different test, a different time and a different standard that I have to find.

As the above quoted passage makes clear, the trial court did not rely on the jury's prior verdict in determining by clear and convincing evidence that Wynn stole the antique watch and the Lucas bag from the Garrison home.[6] Because the trial court's decision on this matter was independent of the prior jury verdict, the subsequent reversal of that verdict does not affect the trial court's decision to admit the other crimes evidence in this case. *See United States v. Beasley,* 809 F.2d 1273, 1276 n. 1 (7th Cir.1987) (suggesting that the reversal of a conviction on appeal does not later preclude evidence of that crime being introduced as similar act evidence showing intent). The trial court did not err in finding that Wynn's participation in the Garrison break-in was established by clear and convincing evidence.

### Necessity and Probative Value versus Undue Prejudice

The remaining inquiry is whether the necessity for and probative value of that evidence were outweighed by any undue prejudice to Wynn. The determination whether the probative value of this evidence is sufficient to outweigh its prejudicial effect is within the sound discretion of the trial court. *See Merzbacher v. State,* 346 Md. 391, 405, 697 A.2d

---

**6.** During the trial of this case, the trial judge reiterated his application of the *Faulkner* test for admissibility of the evidence. During a bench conference, he said:

Because I have previously found in the motions that there is clear and convincing evidence that in fact there was a break-in and that the item, the watch, was in fact taken, the watch that was found in the Lucas bag. But is primarily the watch and the Lucas bag.... Let me say, without the watch, I don't know whether I would allow it, the Lucas bag alone. But I never have to cross that bridge because it was very ... distinctive.... I want at this juncture to say that there is clear and convincing evidence that this crime did take place; that that watch that was found in the defendant's house was in fact the watch that was taken in this housebreaking; and that the probative value of this on the issue of absence of mistake outweighs the prejudice to the defendant.

432, 439 (1997). Because Wynn affirmatively placed at issue a theory of the case contesting the *mens rea* and the *actus reus,* the other crimes evidence in this case took on a heightened relevance and necessity which justified admission. I would hold that the trial judge did not abuse his discretion in finding that the necessity for and probative value of the evidence outweighed any unfair prejudice to Wynn.

The majority suggests that "[t]he trial court could not possibly have made a correct balancing of probative value and prejudicial effect based upon the reason given in the dissent as that reason appears there for the first time. Nor could petitioner have argued properly the third step of the *Faulkner* analysis at the trial court level because the reason now relied upon by the dissent had not then been presented." Maj. op. at 324. I believe it patently clear from the record that the trial judge admitted the evidence solely for the jury to consider the improbability of the defense that Petitioner acquired the goods at a flea market. Because he characterized the evidence as "absence of mistake" does not mean that the reasons were never presented below.

Maryland Rule 5–404(b) is based on the premise that it is fundamentally unfair to convict a criminal defendant for being a "bad person." Rule 5–404(b), however, is not a sword which allows the defendant to place before the jury any theory of defense, and then simultaneously keep from the jury evidence which logically rebuts that defense on grounds other than criminal propensity. *See United States v. Beechum,* 582 F.2d 898, 909 (5th Cir.1978) (*en banc*) ("It is derogative of the search for truth to allow a defendant to tell his story of innocence without facing him with evidence impeaching that story."), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Although the defendant did not testify in the instant case, the record is nonetheless replete with indications that Wynn predicated his defense before the jury on the notion that he lacked the culpability prerequisite to his conviction for the offenses charged.

Other courts have recognized that once a defendant puts forth a defense premised on an innocent or non-culpable state of mind, evidence of other criminal acts which tends to logically refute the claim of an innocent state of mind on a basis other than criminal propensity attains heightened probative value, and thus becomes admissible. *United States v. Myerson*, 18 F.3d 153, 166–67 (2nd Cir.), *cert. denied*, 513 U.S. 855, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994); *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir.1993), *cert. denied sub nom. Mangano v. United States*, 513 U.S. 1059, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994); *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir.1993), *cert. denied sub nom. Arnold v. United States*, 511 U.S. 1094, 114 S.Ct. 1858, 128 L.Ed.2d 481 (1994); *United States v. Tylkowski*, 9 F.3d 1255, 1262 (7th Cir.1993); *United States v. Nickens*, 955 F.2d 112, 123–26 (1st Cir.), *cert. denied*, 506 U.S. 835, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); *United States v. Gomez*, 927 F.2d 1530, 1534 (11th Cir.1991); *United States v. Rhodes*, 779 F.2d 1019, 1031 (4th Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *United States v. Brunson*, 549 F.2d 348, 361 (5th Cir.), *cert. denied*, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977); *Garibay v. United States*, 634 A.2d 946, 948 (D.C.1993); *State v. Wasinger*, 220 Kan. 599, 556 P.2d 189, 193 (1976); *Kahey*, 436 So.2d at 489; *VanderVliet*, 508 N.W.2d at 132; *Cantrell v. State*, 731 S.W.2d 84, 91 (Tex.Crim.App.1987); *State v. Sullivan*, 216 Wis.2d 768, 576 N.W.2d 30, 38 (1998).

Under the doctrine of chances, the trier of fact need not focus on the defendant's bad character. In his discussion of the use of the doctrine of chances to prove the *actus reus*, in the context of a child abuse case, Professor Imwinkelried has explained the distinction by analogy:

[U]nder the doctrine of chances, the trier need not focus on the accused's subjective character. Under the doctrine of chances, the initial decision facing the trier is whether the uncharged incidents are so numerous that it is objectively improbable that so many accidents would befall the accused. The decision is akin to the determination the trier must make in a tort case when the plaintiff relies on *res ipsa*

*loquitur.* In the tort setting, the trier must decide whether objectively the most likely cause of the plaintiff's injury is the defendant's negligent act. In the present setting, the trier must determine whether the more likely cause of the victim's injury is the act of another human being.

Imwinkelried, *supra,* 51 OHIO ST. L.J. at 586–87 (footnotes omitted).[7]

In this case, the other crimes evidence was admissible because it was not offered to prove propensity. As I have previously discussed, the evidence of Wynn's complicity in the Garrison break-in also tended to rebut the defense that he

---

7. Professor Imwinkelried recounts Dean Wigmore's hypothetical exemplifying the use of the uncharged misconduct evidence:

[I]f A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim . . . as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not as a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small; or (to put it another way) because inadvertence or accident is only an abnormal or occasional explanation for the discharge of a gun at a given object, and therefore the recurrence of a similar result (i.e., discharge towards the same object, A) excludes the fair possibility of such an abnormal cause and points out the cause as probably a more natural and usual one, i.e., a deliberate discharge at A. In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result . . . tends (increasingly with each instance) to negative . . . inadvertence . . . or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.

Imwinkelried, *supra,* 51 OHIO ST. L.J. at 594 (alteration in original) (citing 2 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 302, at 241 (1979)). As Professor Imwinkelried points out, the intermediate inference is a conclusion about the objective improbability of the accused's innocent involvement in so many similar incidents. Likewise, in the case before the Court, this focus on the intermediate inference to be drawn from the other crimes evidence—the objective improbability of Wynn's innocent involvement with the watches and the Lucas gym bag—reduces the risk that a jury will render a verdict on an improper basis. *See id.* at 587.

innocently purchased the goods stolen from the Quigley home. The trial judge did not abuse his discretion in determining that the probative value of the other crimes evidence in this case was strong. First, as discussed, that evidence enjoyed heightened relevance vis-a-vis Wynn's theory of defense premised upon an innocent state of mind. Second, the need for the evidence was strong: it was the only evidence that the State could introduce which would logically refute Wynn's claim that he innocently purchased the goods stolen from the Quigley home at a flea market. In addition, the trial court gave the jury a proper limiting instruction, stating that the evidence was not to be considered for the purpose of showing that Wynn would have the propensity or disposition to commit the crime charged in the indictment.[8] Thus, the jury's focus was

---

**8.** The trial judge's limiting instruction was very forceful. He told the jury:

> Let me tell you, ladies and gentlemen, the proffer in this case is that this is going to be evidence that the defendant committed another crime. That is the essence of this.
>
> And he is not charged with that crime. I want you to understand that. He is not charged in this case with stealing anything from Mr. Garrison's house. And that is the crime we are really talking about here, stealing something, going into somebody's house, a housebreaking, and stealing something from that house.
>
> Mr. Garrison is going to testify. You are going to weigh this testimony, as per credibility, as you do any other testimony.
>
> But if you believe that in fact Mr. Garrison's house was burglarized or there was a housebreaking of Mr. Garrison's house, and the items which he is going to testify about were in fact taken, and that those are the same items that were found in the defendant's apartment, the only reason I am allowing this testimony in is it goes to an issue in the case we have, which is the housebreaking that is alleged [at the Quigley house].
>
> And that goes to what we call the absence of mistake rule. And the absence of mistake rule in this case—you kind of look querulous when you talk about absence of mistake—is that the likelihood that somebody would buy at an open-air market something that was stolen from the [Quigley] house and also buy something that was stolen from [the Garrison house], that is the real issue.
>
> That is the only issue this goes to. And you are to limit your—any weight that you give to this evidence to this one issue. It doesn't go to whether or not in fact he committed that other crime because it—or this crime that is not charged.

on the intermediate inference sought to be established by the State—the relative improbability of Wynn's explanation; the trial court properly deflected the focus away from Wynn's prior criminal conduct. As the instruction to the jury makes clear, the jury received the other crimes evidence in this case for the express purpose of rebutting Wynn's claim that he innocently acquired the goods stolen from the Quigley home. The other crimes evidence at issue was properly admitted under this theory of relevance. To ignore the basis of admissibility upon which the jury properly received the other crimes evidence in this case, simply because the trial judge mislabeled the theory of relevance justifying its admission as "absence of mistake," is to improperly elevate form over substance.

Finally, Wynn's possession of the antique watch and the Lucas bag did not just slightly, incrementally rebut Wynn's claim of innocent possession of the Quigley goods; that evidence strongly rebutted Wynn's "defense." If the antique watch had been the only misconduct evidence that the State introduced, Wynn may have had a strong argument that the probative value of that evidence was slight. Wynn could have argued that the same thief stole both the antique watch from the Garrison home and the watches from the Quigley home; then, the thief sold all the watches to the same purchaser. Thereafter, Wynn would have, coincidentally, bought all of the watches at the flea market. That sequence of events has an aura of plausibility. Much less so once the Lucas bag was offered into evidence.

The real thief's nearly contemporaneous theft of watches from several homes, combined with Wynn's affinity for such timepieces, may have produced an unusual but plausible coincidence of events. Yet, it would be highly extraordinary if Wynn innocently purchased the watch stolen from the Garri-

---

But it goes to whether or not what the likelihood is that somebody would buy something like that, another stolen item. That is the only issue. If you find this is credible....

And I just want to say one last thing. The reason I am telling you this now is that I want to make sure that when you hear this testimony you understand the context in which it is coming in to you.

son residence, the watches stolen from the Quigley home, *and* the Lucas gym bag stolen from the Garrison house. This was recognized clearly by the trial judge, and was his basis for admitting the evidence.

As I have discussed, the doctrine of chances rests on the trial court's assessment of the improbability that someone would be innocently involved in similar activity. In determining whether other crimes evidence is sufficiently probative, even one act may be sufficient. *See* Imwinkelried, *supra*, 51 OHIO ST. L.J. at 597–600 (1990). The proper focus is not necessarily quantitative; instead, the proper focus is the qualitative value of the evidence within the particular context of an individual case. Indeed, Professor Imwinkelried advises that "in analyzing the applicability of the doctrine of chances, it seems wrong-minded to focus on the absolute number of incidents. Rather, the focus should be on relative frequency." IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE, *supra*, § 5:06, at 15. Similarly, "[h]ow many similar events are enough depends on the complexity and relative frequency of the event rather than on the total number of occurrences." *Sullivan*, 576 N.W.2d at 39 (footnote omitted). The unlikely coincidence that Wynn purchased the items at a flea market triggered the court's appropriate, albeit unspecified, application of the doctrine of chances. Moreover, the clear and immediate limiting instruction given by the trial judge further supports the conclusion that the trial court did not abuse its discretion in admitting evidence of Wynn's prior criminal acts.

The majority opinion assumes that to affirm the judgment in this case would lead to the "exceptions" in Maryland Rule 5–404(b) swallowing the general prohibition against other crimes evidence any time allegedly stolen property is found in a defendant's possession and the defendant enters a not guilty plea. I agree that there exists the potential for abuse. For other crimes evidence to be admissible in such a scenario, the evidence must be substantially relevant to a genuinely contested issue in the case. *See Harris*, 324 Md. at 500, 597 A.2d at 961–62. In other words, the *actus reus* or *mens rea* must genuinely be in dispute. In addition, the probative value of

that evidence must substantially outweigh any unfair prejudice to the defendant. *See id.*

To guard against the exception swallowing the rule, courts should not admit other crimes evidence under the doctrine of chances whenever offered by the prosecution. Before admitting evidence of the accused's uncharged crimes, in complete faithfulness to the first prong of the *Faulkner* test, the trial judge should require the prosecution to satisfy certain foundational requirements: (1) the uncharged incident must be similar, although not necessarily identical, to the charged crime; (2) an assessment of improbability; (3) a *bona fide* need for the evidence; and (4) a temporal relationship between the uncharged misconduct and the act charged. *See Crawford,* 582 N.W.2d at 811 (dissenting opinion). *See also* Imwinkelried, *supra,* 51 OHIO ST. L.J. at 595–598.

## II.

The majority erroneously concludes that in determining the admissibility of the other crimes evidence in this case, it is proper for this Court to consider only the absence of mistake exception to Rule 5–404(b). In support of that conclusion, the majority relies upon Rule 8–131. The majority is in error for several reasons.

First, it should be noted that even were this conclusion accurate, today's reversal of Wynn's conviction is misguided. As discussed above, the Court of Special Appeals did not misconstrue the "absence of mistake" exception in upholding the admission of "other crimes evidence" and for that reason, this Court should address the State's argument that the other crimes evidence was admitted properly. The doctrine of chances could reasonably be viewed either as a separate theory of relevance upon which to base the admissibility of other crimes evidence or as the theoretical underpinning of the absence of mistake or accident exception explicitly relied upon by the trial judge. The doctrine is often catalogued, however, under the intent or absence of mistake or accident exceptions rather than separately. *See, e.g., Lough,* 853 P.2d

at 931 ("[T]he doctrine of chances is most often invoked when intent or absence of mistake are in issue."); *VanderVliet,* 508 N.W.2d at 125 n. 30 ("The doctrine of probabilities may be used to prove mens rea, or to disprove accident."). As the theoretical underpinning of absence of mistake, it resolves the majority's complaint that the issue is not encompassed within the certiorari petition.

Second, the single issue challenged by this appeal is the admission of specific evidence of other crimes, namely that of the Garrison housebreaking and Wynn's possession of items stolen from the Garrison home. Consideration of this issue need not be formalistically confined to a single basis for admission under Rule 5–404(b) but rather our review should be directed to whether the trial court's admission of the disputed evidence was proper under this rule. Moreover, should it be perceived that the doctrine of chances embodies a separate theory of relevance under which a court might admit other crimes evidence, such classification should present no bar to the admissibility of the evidence in this case. Any distinctions that might be made as to where in Rule 5–404(b) the doctrine of chances belongs are immaterial. This court has stated before that the list of enumerated exceptions in Rule 5–404(b) is not exclusive. *See Harris,* 324 Md. at 501, 597 A.2d at 962; *Ross v. State,* 276 Md. 664, 669–70, 350 A.2d 680, 684 (1976). The disputed evidence was substantially relevant to this case and it appears plainly on the record that the issue of its admissibility was decided by the trial court and Court of Special Appeals.

Third, even if admissibility of the disputed evidence under the doctrine of chances were a new issue, Rule 8–131(a) affords an appellate court the discretion to consider it. *See Crown Oil v. Glen,* 320 Md. 546, 560–61, 578 A.2d 1184, 1190–91 (1990); *Watson v. Peoples Ins. Co.,* 322 Md. 467, 484, 588 A.2d 760, 768 (1991). There is no prejudice in that the issue was decided, albeit under a different name, in the circuit court and the intermediate appellate court.

Finally, at the very least, the majority itself errs in failing to address the harm of the error it finds the trial court to have committed. Rule 8–131(b) plainly allows this Court to consider whether the error was harmless or prejudicial even if not specifically raised in the certiorari petition or cross-petition. Rule 8–131(b)(1) states in pertinent part:

> Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial *even though the matter of harm or prejudice was not raised in the petition or in a cross-petition.* (Emphasis added).

As the Supreme Court has held, trial errors, as opposed to structural defects or errors that "transcend the criminal process," do not call for automatic reversal but rather are to be subjected to "harmless error" analysis. *Arizona v. Fulminante,* 499 U.S. 279, 309–11, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991).

For all the reasons stated above, I respectfully dissent.